Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN STUART, Individually and on behalf of all others similarly situated, | **Case No:** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| GINKGO BIOWORKS HOLDINGS, INC. F/K/A SOARING EAGLE ACQUISITION CORP., HARRY E. SLOAN, JASON KELLY, and MARK DMYTRUK, | |
| Defendants. | |

Plaintiff Kevin Stuart ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ginkgo Bioworks Holdings, Inc. f/k/a Soaring Eagle Acquisition Corp. ("Ginkgo" or the "Company"), analysts' reports and advisories about the Company, and other

information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Ginkgo between May 11, 2021 and October 5, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains an office within this judicial district.

5.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

Class Action Complaint for Violation of the Federal Securities Laws

**PARTIES**

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Ginkgo purportedly operates a horizontal platform for cell programming, designed to enable biological production of products as diverse as novel therapeutics, key food ingredients, and chemicals currently derived from petroleum. Before the merger with special purpose acquisition company ("SPAC") Soaring Eagle Acquisition Corp. ("Soaring Eagle"), the Company was known as Ginkgo Bioworks, Inc.

8.      The Company is incorporated in Delaware and has its headquarters in Boston, Massachusetts. Gingko maintains an office in Emeryville, California. Shares of Ginkgo's common stock have been listed on the New York Stock Exchange ("NYSE") under the ticker symbol "DNA" since September 17, 2021. Prior to the merger, the Company's ordinary shares traded on the NASDAQ under the ticker symbol "SRNG."

9.      Defendant Harry E. Sloan ("Sloan") is and was at all pertinent times the Chief Executive Officer ("CEO") and Chairman of Soaring Eagle. Since the merger, Sloan has served as a Director of Gingko.

10.     Defendant Jason Kelly ("Kelly") is one of Ginkgo's founders. He is and was at all pertinent times the CEO of Gingko, as well as a Director of the Company.

11.     Defendant Mark Dmytruk ("Dmytruk") is and was at all pertinent times the Chief Financial Officer ("CFO") of Gingko.

12.     Defendants Sloan, Kelly, and Dmytruk are sometimes referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

- 3 -

Class Action Complaint for Violation of the Federal Securities Laws

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Materially False and Misleading Statements**

17.     On May 11, 2021, the Company issued a Press Release, attached to Soaring Eagle's Form 8-K filing with the SEC that same day, entitled "Ginkgo Bioworks to Become a Public Company and Expand its Leading Platform for Cell Programming." The press release announced that Gingko Bioworks, Inc. had entered into a definitive business combination with Soaring Eagle that would result in Ginkgo Bioworks, Inc. becoming a publicly-listed company via SPAC merger. The press release stated that "[t]he ***transaction implies a pre-money equity valuation for Ginkgo of $15.0 billion***, and is expected to provide up to $2.5 billion of gross cash proceeds." (Emphasis added).

Class Action Complaint for Violation of the Federal Securities Laws

18.     On May 14, 2021, Soaring Eagle filed with the SEC a prospectus on Form S-4 signed by Defendants Sloan and Kelly. On June 28, 2021, July 16, 2021, August 4, 2021, and August 9, 2021, Soaring Eagle filed revised versions of the prospectus for the merger on Forms S-4/A, which was declared effective on August 11, 2021. On August 13, 2021, Soaring Eagle issued a Proxy Statement with the SEC on Form 424(b)(3) which was signed by Defendants Sloan and Kelly. The Proxy Statement stated the following, in pertinent part, about the Company's business model:

> Our business model mirrors the structure of our platform and we are compensated in two primary ways. First, we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services. The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023. ***Foundry revenue was $59.2 million for the year ended December 31, 2020 and $22.5 million for the three months ended March 31, 2021. Additionally, we negotiate a value share with our customers (typically in the form of royalties, milestones, and/or equity interests) in order to align our economics with the success of the programs enabled by our platform. As we add new programs, our portfolio of programs with this "downstream" value potential grows***. Through these value shares, we are tapping into what industry sources expect to be a $2 to $4 trillion market for bioengineered products.

> \*        \*        \*

> Our cell programming platform is a key enabling technology and source of intellectual property for our customers' products. We earn both Foundry revenue for our research and development ("R&D") services as well as a share of the value of products created using our platform.

> \*        \*        \*

> Downstream value share arrangements which involve equity interests fall into two categories: Platform Ventures and Structured Partnerships.

(Emphasis added).

19.     The Proxy Statement stated the following, in pertinent part, about the Company's Foundry revenue:

Class Action Complaint for Violation of the Federal Securities Laws

We generate Foundry revenue through the execution of license and collaboration agreements whereby customers obtain license rights to our proprietary technology and intellectual property for use in the development and commercialization of engineered organisms and derived products. Under these agreements, we typically provide R&D services for cell programming with the goal of producing an engineered cell that meets a mutually agreed specification. Our customers obtain license rights to the output of our services, which are primarily the optimized strains or cell lines, in order to manufacture and commercialize products derived from that licensed strain or cell line. Generally, the terms of these agreements provide that we receive some combination of (i) upfront payments upon consummation of the agreement that are recognized over our period of performance, (ii) reimbursement for costs incurred for R&D services, (iii) milestone payments upon the achievement of specified technical and/or commercial criteria, (iv) royalties on sales of products from or comprising engineered organisms arising from the license and collaboration agreement and (v) royalties related to cost of goods sold reductions realized by our customers. For the three months ended March 31, 2021 and 2020 and the years ended December 31, 2020 and 2019, royalties did not comprise a material amount of our revenue.

***Foundry revenue includes transactions with Platform Ventures (Motif, Joyn, Allonnia and Kalo) as well as other Structured Partnerships (Genomatica and Synlogic) where, as part of these transactions, we received an equity interest in such entities. Specifically related to the Platform Ventures, in these transactions, we received upfront non-cash consideration in the form of common equity interests in these entities, while the Platform Ventures each received cash equity investments from industry-leading strategic partners and financial investors.*** We view the upfront non-cash consideration as prepayments for licenses which will be granted in the future as we complete mutually agreed upon technical development plans. In these instances, we also receive cash payments for our costs incurred for the R&D services performed by us, plus a margin. We are not compensated through additional milestone or royalty payments under these arrangements. Our transactions with Genomatica and Synlogic included the purchase of equity securities and the provision of R&D services. As we perform R&D services under the mutually agreed upon development plans, we recognize a reduction in the prefunded obligation based on a cost incurred, plus margin. ***Because of our equity holdings in these entities, each is considered as a related party.*** These arrangements are further described in Notes 8, 17 and 21 of our audited consolidated financial statements and in Notes 7, 15 and 17 of our unaudited condensed consolidated financial statements included elsewhere in this proxy statement/prospectus.

Downstream value share in the form of equity interest appreciation is not recognized as revenue but is expected to contribute to future cash flows upon liquidation, the amount and timing of which is inherently unpredictable. Equity

- 6 -

investees are accounted for as equity method investments or cost method investments.

(Emphasis added).

20.     The Proxy Statement reported the following revenue from related parties:

**21.   Related Parties**

Related party transactions included in the Consolidated Balance Sheets, excluding the Company's investments and equity method investments, are summarized below (in thousands):

|  | Joyn | Motif | Genomatica | Allonnia | Synlogic | Total |
|---|---|---|---|---|---|---|
| **Balances as of December 31, 2020** | | | | | | |
| Accounts receivable, net | $    — | $ 2,403 | $   1,500 | $ 1,309 | $    — | $   5,212 |
| Prepaid expenses and other current assets | $     24 | $    232 | $       — | $      13 | $    — | $      269 |
| Deferred revenue, current and non-current | $ 9,862 | $53,952 | $ 30,128 | $26,064 | $    72 | $120,078 |
| **Balances as of December 31, 2019** | | | | | | |
| Accounts receivable, net | $    163 | $ 4,054 | $       — | $     — | $    — | $   4,217 |
| Deferred revenue, current and non-current | $17,135 | $62,513 | $ 38,059 | $24,480 | $ 144 | $142,331 |

Related party transactions included in the Consolidated Statements Operations and Comprehensive Loss, excluding the losses on the Company's investments and equity method investments, are summarized below (in thousands):

|  | Joyn | Motif | Genomatica | Allonnia | Synlogic | Glycosyn | Total |
|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2020** | | | | | | | |
| Foundry revenue | $ 7,273 | $ 20,798 | $   9,431 | $ 4,960 | $    73 | $    — | $ 42,535 |
| Other income, net | $    407 | $    314 | $       — | $     — | $    — | $    — | $      721 |
| **For the Year Ended December 31, 2019** | | | | | | | |
| Foundry revenue | $ 9,349 | $ 18,986 | $   6,248 | $     — | $    17 | $   668 | $ 35,268 |
| Interest income | $    — | $    — | $       — | $     — | $    — | $   163 | $      163 |
| Other income, net | $    222 | $     42 | $       — | $     — | $    — | $ 1,530 | $   1,794 |

21.     In the months leading up to the IPO, the Company announced a flurry of new R&D partners. For example, on August 12, 2021, the Company issued a press release announcing a partnership with Antheia to "accelerate the development and production of essential medicines." According to the press release, "Antheia plans to leverage Ginkgo's high throughput enzyme design and screening capabilities to broaden its pipeline of critical active pharmaceutical ingredients (APIs) and key starting materials (KSMs)." However, the press release does not mention that Ginkgo's largest investor, Viking Global Opportunities Illiquid Investments Sub-Master LP, had just led Antheia's $73 million financing a few weeks prior to the partnership announcement.

22.     Shortly thereafter, the Company announced another partnership agreement with Tantu, a company that engineers living biotherapeutic products to treat gastrointestinal diseases. On September 7, 2021, the Company issued a press release stating, in pertinent part, that "Tantu

will leverage Ginkgo's foundries to accelerate strain construction as a key step toward human clinical trials." The press release went on to state:

> Tantu is working to create an orally administered, living biotherapeutic that will produce and apply anti-inflammatory therapeutic proteins directly into diseased sites in the gut, resulting in improved gut barrier function and faster mucosal healing in patients where systemic anti-inflammatory therapies are not enough. Ginkgo plans to apply its automated foundry to accelerate the traditionally slow steps of candidate strain construction and genomic integration and validation with the aim of accelerating Tantu's first program and potentially helping them reach clinical proof of concept in patients faster.

23.     The statements referenced in ¶¶17-22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's failure to derive real revenue from third-party customers left it almost completely dependent on related parties; (2) as a result, most, if not all, of the Company's revenue came from related parties the Company created, funded, or controlled through its ownership and board seats; (3) the Company was misclassifying and underreporting related party revenue in order to conceal the Company's near total-dependence on related parties; (4) many of the Company's new R&D partners are undisclosed related parties and/or façades; (5) as a result, the Company's valuation was significant less than Defendants disclosed to investors; and (6) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Emerges**

24.     On October 6, 2021, market researcher Scorpion Capital released a 175-page report alleging that Ginkgo is a "colossal scam," and describing the Company as a "shell game" whose revenue is highly dependent on related party transactions. The report alleges that Gingko is a "Frankenstein mash-up of the worst frauds of the last 20 years" and "one of the most brazen frauds of the last 20 years."

25.     The report was based on an "intensive investigation into Ginkgo's business model and practices, with a particular focus on the related-party entities that drive the bulk of its revenue." As part of this investigation, Scorpion Capital "completed 21 research interviews, encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related-party "customers."

26.     The Scorpion Capital report stated the following, in pertinent part, about related party transactions:

> . . . ***The majority of [Ginkgo's] foundry revenue, an absurd 72% in 2020, and essentially 100% of its deferred revenue are derived from related-party "customers" it created, funded, controls, or influences via its ownership position and board seats***. Investments into these entities by Ginkgo and its largest investors are recycled back to Ginkgo and recorded as deferred or current revenue. The scheme reflects its woeful, decade-long failure to derive real revenue from third-party customers, forcing it to cover it up with a ploy that we believe to be enabled by its largest holders.
>
> [] **We believe that Ginkgo is concealing the true extent of its dependence on related party revenue** and that it is far greater than it reports. We have uncovered a smoking gun that indicates that ***essentially ALL of its foundry revenue is derived from related parties, suggesting that Ginkgo has engaged in a brazen effort to misclassify and misreport related party revenue and deceive investors with phony accounting***. Our interviews with ex-employees indicated fear inside Ginkgo that its related-party model would fail regulatory scrutiny and derail an IPO, which we believe has prompted a cover-up of its magnitude.
>
> . . . Ginkgo is opaque about the percent of its revenue and deferred revenue which is cash versus non-cash. Based on interviews with its related-party "customers," **we believe that at least half of Ginkgo's reported foundry revenue is phantom – that is, non-cash and pure accounting hocus-pocus**. We spoke with one of its largest such customers, from whom Ginkgo reported $38MM and $30MM of deferred revenue in 2019 and 2020. A senior employee stated unequivocally that they have never paid Ginkgo cash for foundry services and are merely using "free" R&D credits following investments by Ginkgo and Viking. Giving away the essence of the scam, the customer stated they would not use Ginkgo if they had to pay cash, dismissing them as a failed contract research organization (CRO) that they neither trust to deliver nor could justify except under a round-tripping deal.

(Emphasis added).

27.     The Scorpion Capital report claimed that Ginkgo underreported its related party transactions in order to go public, stating in pertinent part:

> We noted earlier that the majority of Ginkgo's foundry revenue comes from related party entities: 65% in 2019, 72% in 2020, and 56% in 2021. **We believe that the actual figure is essentially 100%, and think that Ginkgo is misclassifying and underreporting related party revenue**. While the reported 60-70% percentage is bad enough and indicative of a broken, hocus-pocus business model, it's still better than 100%. Ginkgo can claim that at least 30-40% of foundry revenue comes from third parties, and that its reliance decreased in Q1 2021 to "only" 56%. Ex-employees indicated **fear inside Ginkgo that its related party model doesn't stand up to regulatory scrutiny and could prevent it from going public – hence, we believe, an effort to fake the reported figure**.

| (in thousands) | | | | Year Ended December 31, | |
| --- | --- | --- | --- | --- | --- |
| | | | | 2020 | 2019 |
| Foundry revenue (includes related party revenue of $42,535 and $35,268, respectively) | | | | $ 59,221 | $ 54,184 |

| in millions USD | 2019 | 2020 | Q1 2021 | |
| --- | --- | --- | --- | --- |
| **Foundry revenue by related party** | | | | |
| Joyn | 9,349 | 7,273 | 1,598 | *Reported related party foundry revenues totaled 65% in 2019 and 72% in 2020* |
| Motif | 18,986 | 20,798 | 5,492 | |
| Genomatica | 6,248 | 9,431 | 3,298 | |
| Allonnia | | 4,960 | 2,266 | |
| Synlogic | 17 | 73 | 6 | |
| Glycosyn | 668 | - | - | |
| Kalo | - | - | - | |
| **Total** | 35,268 | 42,535 | 12,660 | |
| **Total foundry revenue** | 54,184 | 59,221 | 22,504 | |
| **Related parties as % of total foundry revenue** | **65%** | **72%** | **56%** | |

Source: Soaring Eagle Acquisition Corp prospectus 8/13/2021, https://www.sec.gov/Archives/edgar/data/0001830214/000119312521246097/d177007d424b3.htm; Scorpion Capital analysis and estimates

48

28.     The Scorpion Capital report highlighted one related party, Synlogic, to show how Ginkgo was underreporting its related party revenue. The report explained:

> **As we examined Ginkgo's related party disclosures, we noted a major anomaly**: Ginkgo invested $80MM in Synlogic in 2018, but disclosed almost no revenue from it in 2019 and 2020 in the footnotes. Similarly, it reported a minimal deferred revenue balance with Synlogic, in Note 21 in the SPAC prospectus. **In every other case, Ginkgo aggressively booked revenue and deferred revenue from related parties** in which it invested.
>
>                    *        *        *
>
> **As Synlogic is a publicly-traded microcap (ticker: SYBX) with $150MM market cap, we examined its SEC filings**. We were amused, but not surprised, to discover that Synlogic's 2020 10K, under Note 16 for Related-Party

Transactions, disclosed that **Synlogic "used $13.6 million of the pre-paid research and development expenses" in 2020. This is in stark contrast to Ginkgo's related party disclosure, which reports only $73K of foundry revenue from Synlogic**.

*    *    *

**Synlogic's disclosures suggest that Ginkgo has misclassified Synlogic's R&D spend in order to conceal its near-total dependence on parties it finances**. Had Ginkgo included Synlogic's foundry spend of $13.6MM, related party revenues as a percent of total **would have jumped from 72% to 95%** - that is, Ginkgo would have had to admit that its foundry is a flop and that it can't get customers unless it gives them cash and round-trips the proceeds.

**Related party revenue as reported**

| in millions USD | 2020 |
|---|---|
| **Foundry revenue by related party** | |
| Joyn | 7,273 |
| Motif | 20,798 |
| Genomatica | 9,431 |
| Allonnia | 4,960 |
| Synlogic | 73 |
| Glycosyn | - |
| Kalo | - |
| **Total** | 42,535 |
| **Total foundry revenue** | 59,221 |
| **Related parties as % of total foundry revenue** | **72%** |

**Adjusted to include Synlogic revenue**

| in millions USD | 2020 |
|---|---|
| **Foundry revenue by related party** | |
| Joyn | 7,273 |
| Motif | 20,798 |
| Genomatica | 9,431 |
| Allonnia | 4,960 |
| Synlogic | 13,600 |
| Glycosyn | - |
| Kalo | - |
| **Total** | 56,062 |
| **Total foundry revenue** | 59,221 |
| **Related parties as % of total foundry revenue** | **95%** |

29.     The Scorpion Capital report also alleged that in the months leading up to the SPAC merger, "Ginkgo has announced a **flurry of new R&D partners, a dog whistle that the scam is about to hit overdrive. We believe these 'partners' are undisclosed related parties and fronts**. Without proliferating new round-tripping arrangements, Ginkgo can't show 'growth' in Q3 and coming quarters." The report further alleged:

**The number of new "partners" announced in the last few weeks just prior to the first day of trading on Sep 17th is stunning**. The partnerships are for everything under the sun: GI drugs, probiotics, herbal medicines and nutraceuticals, "biomaterials," dyes, a material inspired by spiders with "silk-like softness." Notably, not one of the releases below discloses a deal size – and all are **silent on the critical question of whether they are undisclosed related parties – that is, whether Ginkgo or its investors like Viking are investors in the entities or are providing proceeds that will be round-tripped back to Ginkgo**

as "revenue" in coming quarters. **We shortly reveal a smoking gun that exposes the rig as exactly that**.

30.     For example, the report explains that "**The press release for Ginkgo's Antheia partnership on Aug 12, 2021 makes no mention of the fact that Viking led Antheia's $73MM financing a few weeks prior** to the Ginkgo announcement."

31.     Similarly, weeks after the Atheia partnership announcement, Ginkgo announced a partnership with Tantu. However, according to the Scorpion Capital report, this partnership was a concealed related party transaction and front:

> The Tantu partnership announced less than a week after Cambium is particularly grandiose: "**Tantu will leverage Ginkgo's foundries to accelerate strain construction as a key step toward human clinical trials**." Clinical trials presume an advanced program, typically after tens or hundreds of millions spent on R&D. Imagine our surprise after discovering that **Tantu appears to have no full-time employees. It doesn't even appear to be a company, nor even a project – merely an idea**. Co-founder Neel Joshi is a full time associate professor at Northeastern; a second co-founder is currently CEO of another startup; a third was a post-doc in Joshi's lab until August, when she took another job.
>
> *          *          *
>
> Similar to Cambium, we suspected that Tantu is also an undisclosed related-party in which Ginkgo has or will make an investment which will be recycled back as "revenue." We spoke with an individual closely involved with Tantu, who indicated that Tantu has raised $50k to date via a university grant – "just enough to get a website and stuff like that and incorporate." **The individual stated that Tantu "doesn't have money to pay" Ginkgo for R&D services, so "the deal ended up being like a deferred loan, essentially, for the work they are going to do." The individual did not disclose the amount of funding Ginkgo provided, but indicated it was similar in magnitude to a Series A round**.

32.     The Scorpion Capital report also alleged that "[a]side from its 'customers' being related parties and effectively fake, we believe that Ginkgo takes the scam into even more aggressive territory by booking revenue from them that is simply fictitious, overstated, and/or based on overcharging." For example, the report stated:

> We begin with two observations: 1) the R&D and G&A services fees that Ginkgo charges these "customers" and books as revenue and/or deferred revenue **bears no plausible relationship to their size, suggesting they are fraudulent; 2) the**

**timing of when Ginkgo books revenue and/or deferred revenue is equally
implausible,** sometimes before the entities even appear to have any employees or
be functional, which further indicates they are simply sham transactions. For
example, LinkedIn indicates only 6 employees at Allonnia LLC, yet Ginkgo
records a $38MM deferred revenue balance, on top of booking $5MM of revenue
from Allonnia in 2020 and $2.3MM in Q1 2021 – a $9MM annual run rate.

33.     On this news, Ginkgo's shares fell $1.39 per share, or approximately 12%, to close at
$10.59 per share on October 6, 2021, damaging investors.

34.     As a result of Defendants' wrongful acts and omissions, and the decline in the
market value of the Company's securities, Plaintiff and other Class members have suffered
significant losses and damages.

35.     On November 15, 2021, the Company acknowledged that shortly after the Scorpion
Capital report, Ginkgo received an inquiry from the United States Department of Justice relating to
the financial misconduct allegations in the report.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise
acquired the publicly traded securities of the Company during the Class Period (the "Class"); and
were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class
are Defendants herein, the officers and directors of the Company, at all relevant times, members of
their immediate families and their legal representatives, heirs, successors or assigns and any entity
in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is
impracticable. Throughout the Class Period, the Company's securities were actively traded on the
NYSE or the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this
time and can be ascertained only through appropriate discovery, Plaintiff believes that there are
hundreds or thousands of members in the proposed Class. Record owners and other members of the
Class may be identified from records maintained by the Company or its transfer agent and may be
notified of the pendency of this action by mail, using the form of notice similar to that customarily
used in securities class actions.

Class Action Complaint for Violation of the Federal Securities Laws

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•       whether the federal securities laws were violated by Defendants' acts as alleged herein;

•       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

•       whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

•       whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

•       whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

•       whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

•       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

Class Action Complaint for Violation of the Federal Securities Laws

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the Company's securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE or the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

43.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

49.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

Class Action Complaint for Violation of the Federal Securities Laws

50.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

51.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

52.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

53.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

Class Action Complaint for Violation of the Federal Securities Laws

56.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

57.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

58.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

59.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

60.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 18, 2021                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Class Action Complaint for Violation of the Federal Securities Laws