**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| KEVIN STUART, individually and on behalf of all others similarly situated,<br><br>                       Plaintiff,<br><br>     v.<br><br>GINKGO BIOWORKS HOLDINGS, INC. F/K/A SOARING EAGLE ACQUISITION CORP., HARRY E. SLOAN, JASON KELLY, and MARK DMYTRUK,<br><br>                   Defendants. | Case No. 4:21-cv-08943-KAW<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>HON. KANDIS A. WESTMORE |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................................1

JURISDICTION AND VENUE ..................................................................................6

PARTIES ....................................................................................................................6

FACTS COMMON TO ALL CLAIMS ......................................................................9

I.    SRNG Forms As A SPAC To Acquire A Company With High Free
      Cash Flow Potential ........................................................................................9

II.   SRNG Claims Extensive Due Diligence Confirmed Ginkgo's Business
      Operations and Valuation ..............................................................................11

III.  False And Misleading Statements In the Defective Proxy/Registration
      Statement.......................................................................................................13

IV.   Shareholders Approve the Merger and Complete Ginkgo's IPO Via the Defective
      Proxy/Registration Statement .......................................................................24

V.    Third Parties Disclose Material Information Omitted or Misstated in the Defective
      Proxy/Registration Statement .......................................................................25

ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV and V ............33

NO SAFE HARBOR ................................................................................................34

CLASS ACTION ALLEGATIONS .........................................................................35

COUNT I ..................................................................................................................38

COUNT II .................................................................................................................39

COUNT III ...............................................................................................................40

COUNT IV................................................................................................................42

COUNT V .................................................................................................................43

PRAYER FOR RELIEF ...........................................................................................44

1

DEMAND FOR JURY TRIAL ....................................................................................................45

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lead Plaintiff Sharon Bernstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for Plaintiff's amended complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Ginkgo Bioworks Holdings, Inc. ("Ginkgo" or the "Company") and Soaring Eagle Acquisition Corp. ("Soaring Eagle" or "SRNG"); analysts' reports and advisories about the Company; information obtained from interviews with knowledgeable individuals; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of the following three classes:

    a.      <u>Securities Act Class</u>: a class consisting of all persons who purchased or otherwise acquired shares in Ginkgo (including by way of exchange of SRNG shares) pursuant or traceable to the defective proxy/registration statement that Defendants filed with the SEC on Form S-4 on May 14, 2021, and that was thereafter amended on Forms S-4/A on June 28, 2021, July 16, 2021, August 4, 2021, and August 9, 2021 and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on August 13, 2021.  The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act.  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

    b.      <u>14(a) Class</u>: a class consisting of all persons who were solicited to approve the merger and to retain rather than redeem SRNG shares pursuant to the defective

proxy/registration statement filed on Form S-4.  The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c.  10(b) Class: a class consisting of all persons who purchased or otherwise acquired in a public offering or on public markets securities of Ginkgo (including its predecessor SRNG) between May 11, 2021 and October 5, 2021, both dates inclusive (the "10(b) Class Period").  The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors of Ginkgo or SRNG; (c) any entity that has entered into a stockholder agreement or co-venture agreement with Ginkgo, or was a Private Investment in Public Equities ("PIPE") investor in Ginkgo; and (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

2.     Ginkgo is a biotechnology company incorporated in 2008 with substantial offices in this Judicial District and with its headquarters at 27 Drydock Avenue 8th Floor, Boston Massachusetts 02210.  Ginkgo bills itself as a synthetic biology company but, stripped of jargon, primarily provides commodity engineering of the *Pichia pastoris* yeast strain, the same service provided by many other companies.  An article on Ginkgo describes the process as follows:

> Similar to how beer is brewed — where yeast eats sugars and creates alcohol and flavors through fermentation — Ginkgo's "hacked" yeast eats fatty acids and produces desired chemicals that recreate certain scents and flavors during fermentation. Those chemicals can then be extracted and used in a number of different products.

*See* https://news.mit.edu/2016/startup-ginkgo-bioworks-engineered-yeast-0825.

3.      Ginkgo's business consists of two parts, which it calls "Foundry" and "Codebase." The Foundry is a yeast strain engineering lab with which Ginkgo provides R&D services to other companies.  The Codebase is a repository of the strains it has produced and the data it has retained about those strains.

4.      Ginkgo went public on September 17, 2021 via a merger with the Soaring Eagle special

purpose acquisition company ("SPAC") that was registered as an offering with the SEC pursuant to the Securities Act on Form S-4.  The final full amended signed Form S-4/A filed on August 4, 2021, the body of which was incorporated into the prospectus filed on Form 424(b)(3) on August 13, 2021, together with information filed under Form 425 as a supplement to that registration statement pursuant to Rule 425 promulgated under the Securities Act, is hereafter referred to as the "Defective Proxy/Registration Statement."

5.      The Defective Proxy/Registration Statement described Ginkgo's business as operating "in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services."  This was not so.  In fact, Ginkgo and/or Ginkgo's three largest outside investors – Viking Global, Cascade, and General Atlantic, who collectively owned 42.8% of Ginkgo at the time – provided the overwhelming majority of funds that were recirculated by related-party companies back to Ginkgo as "charge[s] for services."

6.      For example, in 2019, Ginkgo paid related-party Synlogic approximately $80 million for Synlogic stock (ticker symbol "SYBX") and warrants that Ginkgo agrees were worth only $50 million, and at the same time entered into an agreement whereby Synlogic would recycle the $30 million overpayment back to Ginkgo as a "nonrefundable prepayment for Foundry services."   The circular payments are summarized as follows:



Ginkgo pays Synlogic $30MM more than fair value for SYBX shares/warrants

Synlogic gives Ginkgo $30MM "nonrefundable prepayment" for R&D services

7.      Each of Ginkgo's related-party deals differed slightly, but all served to manufacture the

appearance of economic activity that would not occur in an arms' length transaction.  These included:

    a.   **Allonnia** is a company that was housed in Ginkgo's Boston office building that lists Ginkgo employees, including Defendant Kelly and Ginkgo's Head of Ventures Jason Kakoyiannis as its managers.  In 2019, Allonnia took in $33 million in financing principally from Ginkgo's largest investors, and began to recirculate those funds back to Ginkgo for R&D services in amounts that were grossly out of line with the few employees Allonnia had.

    b.   **Kalo Ingredients** was formed in March 2021 and also lists Ginkgo's Boston address as its principal office, and Ginkgo employees as its managers.  Upon formation it received financing from Ginkgo's own investors, and only 16 days after formation Ginkgo claimed to have booked $11.9 million in deferred revenue from Kalo Ingredients, which appears to have been Ginkgo investor funds recirculated back to Ginkgo in the form of prepayments.

    c.   **Motif FoodWorks** is another so-called customer that actually was housed at Ginkgo's Boston office, listed Defendant Shetty as its corporate agent, and listed Defendant Kelly and Jason Kakoyiannis as its directors.  In a complex web of transactions, Ginkgo investors led a $90 million preferred stock investment in Motif FoodWorks, and Motif FoodWorks provided Ginkgo common stock, then worth $65.1 million, which served as a prepayment for R&D services and licensing and was treated as deferred revenue by Ginkgo.  Ginkgo recognized revenue of $20.8 million from Motif FoodWorks in 2020 and $19.0 million in 2019.

    d.   **Genomatica** was a pre-existing entity when Ginkgo participated in an investment round led by Ginkgo's largest investor, Viking Global.  Pursuant to the deal, Ginkgo would receive $40 million worth of Genomatica preferred stock in exchange for agreeing to provide Genomatica with $40 million of R&D services at no charge.  Those amounts were grossly out of proportion with Genomatica's needs: Ginkgo only recognized $6.2 million from Genomatica in 2019 and $9.4 million in 2020.

    e.   **Joyn Bio** is a joint venture between Ginkgo and Bayer, that is housed in Ginkgo's 27

Drydock Boston office and lists Defendants Kelly and Shetty as managers. Most of the funding from the Ginkgo side of the venture was provided by an undisclosed "investor" identified only as a related-party of Ginkgo. Upon formation, Joyn Bio promptly funneled $20M in cash back to Ginkgo as a "nonrefundable prepayment" for technical services. In 2019, Joyn Bio made an additional $15 million prepayment funneling cash to Ginkgo, although it had not yet expended the initial prepayment.

8.     To make these supposedly separate companies even more conjoined, they often rotated employees or invested in each other. For example, Dayal Saran, a program director at Ginkgo, took on executive roles at Motif FoodWorks, Synlogic, and Allonnia. And, Genomatica swapped equity, cash and intellectual property with an affiliate of Joyn Bio.

9.     The Defective Proxy/Registration Statement's opaque accounting and disclosures about Ginkgo's complex web of related-party deals made it impossible for investors to understand: (a) the degree to which related-party deals were sham transactions designed to repackage funds from Ginkgo's own large investors into Ginkgo as revenue and deferred revenue; (b) the actual value of services performed and obligated; (c) the actual cash flows from Ginkgo's operations; (d) the percent of revenues that actually reflected standard cash transactions similar to the cloud services and CROs with which Ginkgo compared its operations to investors; (e) whether such related parties were independent at all, as opposed to arms and instrumentalities of Ginkgo; (f) the amount of non-related party revenue Ginkgo generated; (g) whether Ginkgo had high free cash flow potential, which was identified to Soaring Eagle investors as a prerequisite for a merger candidate; or (h) Ginkgo's overall economic prospects as a public company.

10.     Exacerbating its related-party misrepresentations, the Defective Proxy/Registration Statement also concealed problems with the few nonrelated-party deals identified. For example, the Defective Proxy/Registration Statement highlighted the potential of a license that Ginkgo sold to cannabis manufacturer Cronos to manufacture lab-grown cannabinoids, but failed to disclose that the license was not providing the expected value to Cronos, which said its license from Ginkgo actually became impaired in the third quarter of 2021, and ultimately had to write down the value of its Ginkgo license.

11.     Based on the information in the Defective Proxy/Registration Statement, SRNG investors had to weigh two large decisions (and a host of smaller proposals, such as board composition).  First, they were to vote to approve or disapprove of the merger.  Second, regardless of their vote, they could decide to retain SRNG shares which would be converted to Ginkgo shares, or redeem their SRNG shares for $10/share.

12.     Ginkgo benefitted from the false and misleading statements contained in the Defective Proxy/Registration Statement.  On September 14, 2021, SRNG investors overwhelmingly approved the merger with Ginkgo, and less than half redeemed shares.  Because Defendants were able to manage the amount of redemptions, the cash contingency was satisfied and the merger closed, making Ginkgo's merger with Soaring Eagle the largest transaction ever to take a biotech company public.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o) and §§10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5, 240.14a-9).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to §22 of the Securities Act, (15 U.S.C. §77v), §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Ginkgo maintains significant offices in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff Sharon Bernstein purchased Ginkgo securities during the Class Period, as described in her Certification previously filed with this Court, *see* ECF No. 11, and suffered damages

as a result of Defendants' violations of federal securities laws alleged herein.

18.    The Company is incorporated in Delaware and has its headquarters in Boston, Massachusetts.  Ginkgo maintains an office in Emeryville, California.  Shares of Ginkgo's common stock have been listed on the New York Stock Exchange ("NYSE") under the ticker symbol "DNA" since September 17, 2021.  Ginkgo went public at that time via a merger with Soaring Eagle.  Prior to that time, the Soaring Eagle existed as a blank check SPAC and traded on the NASDAQ under the ticker symbol "SRNG."

19.    Defendant Harry E. Sloan ("Sloan") was the Chief Executive Officer ("CEO") and Chairman of Soaring Eagle.  Since the merger, Sloan has served as a Director of Ginkgo.  Defendant Sloan signed the Defective Proxy/Registration Statement.

20.    Defendant Eli Baker ("Baker") was the Chief Financial Officer ("CFO") and Secretary of Soaring Eagle.  Defendant Baker signed the Defective Proxy/Registration Statement.

21.    Defendant Scott M. Delman ("Delman") was a director of Soaring Eagle.  Defendant Delman signed the Defective Proxy/Registration Statement.

22.    Defendant Joshua Kazam ("Kazam") was a director of Soaring Eagle.  Defendant Kazam signed the Defective Proxy/Registration Statement via the authorized signature of his attorney-in-fact, Defendant Sloan.

23.    Defendant Isaac Lee ("Lee") was a director of Soaring Eagle.  Defendant Lee signed the Defective Proxy/Registration Statement via the authorized signature of his attorney-in-fact, Defendant Sloan.

24.    Defendant Timothy Leiweke ("Leiweke") was a director of Soaring Eagle.  Defendant Leiweke signed the Defective Proxy/Registration Statement via the authorized signature of his attorney-in-fact, Defendant Sloan.

25.    Defendant Dennis A. Miller ("Miller") was a director of Soaring Eagle.  Defendant Miller signed the Defective Proxy/Registration Statement via the authorized signature of his attorney-in-fact, Defendant Sloan.

26.    Defendant Laurence A. Paul ("Paul") was a director of Soaring Eagle.  Defendant Paul signed the Defective Proxy/Registration Statement via the authorized signature of his attorney-in-fact,

1  Defendant Sloan.

2          27.     Defendant Jason Kelly ("Kelly") is one of Ginkgo's founders.  He is and was at all

3  pertinent times the CEO of Ginkgo.  Kelly was a director of Ginkgo at all times relevant hereto and a

4  director of the Company following the merger.  Kelly gave consent to be listed in the Defective

5  Proxy/Registration Statement as a director of the merged Company.  Kelly also made statements in

6  the Forms 425 filed on May 11, 2021, August 19, 2021, August 20, 2021, and August 23, 2021.  Kelly

7  possessed the power and authority to control the contents of Ginkgo's Form 425 and other SEC filings,

8  press releases, and other market communications.  He was provided with copies of Ginkgo's SEC

9  filings and press releases alleged herein to be misleading prior to or shortly after their issuance and

10  had the ability and opportunity to prevent their issuance or to cause them to be corrected.

11          28.     Defendant Reshma Shetty ("Shetty") is one of Ginkgo's founders.  Shetty gave consent

12  to be listed in the Defective Proxy/Registration Statement as a director of the merged Company, and

13  became a director after the merger was completed.

14          29.     Defendant Arie Belldegrum ("Belldegrum") gave consent to be listed in the Defective

15  Proxy/Registration Statement as a director of the merged Company, and became a director after the

16  merger was completed.

17          30.     Defendant Marijn Dekkers ("Dekkers") gave consent to be listed in the Defective

18  Proxy/Registration Statement as a director of the merged Company, and became a director after the

19  merger was completed.

20          31.     Defendant Christian Henry ("Henry") gave consent to be listed in the Defective

21  Proxy/Registration Statement as a director of the merged Company, and became a director after the

22  merger was completed.

23          32.     Defendant Reshma Kewalramani ("Kewalramani") gave consent to be listed in the

24  Defective Proxy/Registration Statement as a director of the merged Company, and became a director

25  after the merger was completed.

26          33.     Defendant Shyam Sankar ("Sankar") gave consent to be listed in the Defective

27  Proxy/Registration Statement as a director of the merged Company, and became a director after the

28  merger was completed.

34. Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller, Paul, Kelly, Shetty, Belldegrum, Dekkers, Henry, Kewalramani and Sankar are sometimes referred to herein as the "Registration Statement Defendants."

35. Defendant Anna Marie Wagner ("Wagner") served as Ginkgo's Senior Vice President, Corporate Development throughout the Class Period and made the materially misleading statements described in Paragraphs 72, 78 and 80.

## FACTS COMMON TO ALL CLAIMS

### I.   SRNG Forms As A SPAC To Acquire A Company With High Free Cash Flow Potential

36. SRNG, originally known as Spinning Eagle Acquisition Corp. but later renamed Soaring Eagle Acquisition Corp, was a SPAC formed as a corporation in the Cayman Islands in 2020 for the purpose of merging with, and bringing public, a business to be identified by its managers. From its earliest SEC filings, SRNG described itself as a "blank check company."  *See, e.g.,* Form S-1 filed on December 23, 2020.

37. John Coates, speaking as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:

> The basics of a typical SPAC are complex, but can be simplified as follows. A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.
>
> But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing,

> a broader shareholder base, status as a public company with Exchange
> Act registered securities, and a liquid market for its shares.

John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021) (footnotes omitted).

38.     The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interest, and to avoid disclosures that may dissuade investors from exchanging shares in the merger.  If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering, and enjoy considerable control such as the ability to nominate board members to the new company.  However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the transaction may be to the detriment of the public shareholders.

39.     The SPAC structure does not require a shareholder to exchange pre-merger SPAC shares into shares of the merged company.  Instead, after what is supposed to be full disclosure of material information, such holders are afforded the opportunity to redeem shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company, and indirectly impacts the economic interests of SPAC sponsors.  As a result, SPAC sponsors and merger targets are highly incentivized to minimize the number of redemptions by SPAC shareholders.

40.     Companies seeking to go public have increasingly turned to SPAC structures in recent years.  SPAC transactions are faster than traditional IPOs, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company.  However, SPAC mergers also have the potential to be rife with fraud, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny.  SEC officials have also expressed concern over the recent surge in SPACS, in particular about the "baseless hype" by which many are sold.  *See* John Coates, "SPACS, IPOs and Liability

Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021).  As SEC Chair Gary Gensler testified in front of Congress, the "surge of SPACs raises a number of policy questions.  First and foremost, are SPAC investors being appropriately protected?"  *See* https://www.sec.gov/news/testimony/gensler-2021-05-26.

41.     From its earliest filings, SRNG encouraged investors to set aside concerns about it being a "blank check company" by touting the business acumen of SRNG's Board of Directors, and promising that it would focus on an acquisition target with the "potential to generate strong and stable free cash flow."  *See, e.g.,* Form S-1 filed on December 23, 2020.

## II.    SRNG Claims Extensive Due Diligence Confirmed Ginkgo's Business Operations and Valuation

42.     On May 11, 2021, Soaring Eagle announced that it had entered into a merger agreement with Ginkgo.  The merger was intended to effect an initial public offering of Ginkgo shares, which were at that time private.  According to the May 11, 2021 announcement, upon approval and closing of the merger, the surviving company would be renamed "Ginkgo Bioworks Holdings, Inc." and private Ginkgo shares would be exchanged for shares in the surviving company, which it called "New Ginkgo."

43.     As is customary in SPAC transactions, the merger would be contingent upon approval by SRNG shareholders, and regardless of the vote, SRNG shareholders would be permitted to redeem shares at $10/share if they did not want to hold shares in Ginkgo post-closing.  Additionally, the deal was contingent upon having closing cash of at least $1.25 billion.

44.     In the Defective Proxy/Registration Statement, Registration Statement Defendants claimed to have conducted extensive due diligence of Ginkgo:

> Before reaching its decision, the SRNG Board reviewed the results of the due diligence performed on Ginkgo, which included:
>
> - Research on the growth and application of the synthetic biology industry and its specific applications for providing many commercial and biological solutions.
>
> - Extensive meetings (virtually and in-person) and calls with the Ginkgo management team and representatives regarding operations, company services, major customers, financial prospects, the pipeline of potential new programs and applications and possible acquisitions, among other customary

due diligence matters;

- "Channel checks" or interviews with Ginkgo's customers in different industries, including but not limited to pharma, agriculture, manufacturing, and consumer products;

- Engagement of BCG and Deepwave to review and assess the underlying science and technology processes employed by Ginkgo as well as an assessment of the maturity of the synthetic biology field;

- Legal and commercial review of Ginkgo's material business contracts and certain other legal and commercial due diligence;

- Legal review of Ginkgo's patents and trademarks;

- Regulatory review of Ginkgo's products and services in the United States and certain international regions;

- Financial and accounting due diligence; and

- Financial analysis of Ginkgo with assistance of its financial advisors, including a sensitivity analysis based on key drivers to Ginkgo's business.

45.    Based upon their "experience in investing" and "due diligence," Registration Statement Defendants claimed that Ginkgo warranted a whopping valuation of $15 billion.

Given SRNG's experience in investing, the SRNG Board did not seek a third-party valuation, and did not receive any valuation report or opinion from a third party in connection with the Business Combination. Instead, the SRNG Board relied on, among other things, the following in consideration of the Business Combination: (i) due diligence on Ginkgo's business operations; (ii) extensive research reports and data related to the synthetic biology industries in the United States and internationally; and (iii) SRNG management's collective experience in public markets transactions in constructing and evaluating financial models and projections and conducting valuations of businesses.

As part of its financial review, SRNG management performed extensive due diligence regarding the applications of synthetic biology and Ginkgo's ability to share in downstream value creation through its customers. SRNG believes that Ginkgo's ability to add new programs to its platform represents a key value driver, as Ginkgo's contracts typically include both an upfront Foundry revenue component as well as downstream value participation in the form of royalties, milestones, or equity. The platform's "network effect" of an accelerating Codebase and accumulated learning position Ginkgo for growth of projects and new customers, as that accumulated data makes its offerings more unique and differentiated.

In order to arrive at a recommended valuation for launch, the SRNG management team conducted the DCF Analysis and Selected Public Company Analysis (as described below). Based on those analysis and

given the growth prospects of Ginkgo, the size and growth of the TAM, other compelling aspects of the Business Combination and the validation of such valuation in the oversubscribed PIPE placement process involving a number of well-respected institutional investors, the SRNG Board and the SRNG management team determined that the $15 billion valuation was supportable by either the Foundry revenue or the downstream value share. In addition, the SRNG Board recognized that the flexibility of Ginkgo's business model could result in Ginkgo realizing significant upside by realizing the potential of both the Foundry at scale as well as the downstream value share.

46.     Registration Statement Defendants expressly claimed that SRNG's evaluation was conservative and "applied sensitivities to a number of variables" to offset uncertainties.

47.     As a result of this due diligence and what they told investors was "careful consideration," the Registration Statement Defendants told investors that they concluded merging with Ginkgo at a $15 billion valuation for Ginkgo was "in the best interests" of SRNG shareholders, and "unanimously recommend[]" that investors "vote or give instruction to vote '**FOR**'" the proposal. *See* Defective Proxy/Registration Statement (emphasis in original).

48.     The Defective Proxy/Registration Statement expressly directed investors to avoid doing their own due diligence, and instead to rely *solely* on the information they provided or incorporated into that document: "You should rely only on the information contained or incorporated by reference into this proxy statement/prospectus.  No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this proxy statement/prospectus."

**III.    False And Misleading Statements In the Defective Proxy/Registration Statement**

49.     The Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.  Regarding foundry fees, the Defective Proxy/Registration Statement stated: "we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services."  This statement was materially false and misleading when made because: (a) Ginkgo did not charge usage fees in "much the same way" as cloud computing companies or CROs; (b) unlike cloud computing companies or CROs, Ginkgo exploited related-party relationships to force massive

prepayments and above-market fees that are not traditionally charged by cloud computing companies or CROs; and (c) the statements omitted that the "usage fees" that Ginkgo charged were paid from related-parties in many cases using funds provided from Ginkgo itself or Ginkgo's largest investors.

50.    The Defective Proxy/Registration Statement stated that "The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023." This statement was materially false and misleading when made because Ginkgo only provided a limited tool addressing one aspect of biotech "labor and tools": the commodity manipulation of yeast strains, and in particular of *pichia pastoris*. Thus, Ginkgo had no basis to claim to address the entirety of the biotech labor or tools market.

51.    The Defective Proxy/Registration Statement described Ginkgo's foray into related-party ventures as follows:

> Platform Ventures allow leading multinationals to partner with Ginkgo and financial investors to form new ventures in identified market segments with potential to benefit from synthetic biology. In exchange for an equity position in the venture, we contribute license rights to our proprietary cell programming technology and intellectual property, while our partners contribute relevant industry expertise, other resources and venture funding.

These statements were materially false and misleading when made because "leading multinationals" played no role in any of Ginkgo's Platform Ventures other than Joyn Bio. Instead, the Platform Ventures were a fancy name given to investment vehicles created and controlled by Ginkgo, funded either by Ginkgo or Ginkgo's investors, and operating to create circular revenue streams funneling such investments back onto Ginkgo's financial statements.

52.    With respect to Motif FoodWorks, the Defective Proxy/Registration Statement touted Motif FoodWorks as a top-two customer, stating that it "represented more than 10% of our total revenue" but that Ginkgo "is not the primary beneficiary of Motif as it does not control the decisions that most significantly impact Motif's economic performance," including "development activities." The Defective Proxy/Registration Statement depicted the following visual touting the work it claimed to have done for Motif FoodWorks:



53.     The statements identified in Paragraph 52 above were materially false and misleading when made because they omitted: (a) that Ginkgo did in fact exercise control over Motif FoodWorks including its development activities because: (i) principal development activities were conducted by Ginkgo in Ginkgo facilities using Ginkgo tools; (ii) Ginkgo executives Kelly and Kakoyiannis both served as directors of Motif FoodWorks; (iii) Ginkgo embedded a Ginkgo employee as Motif's Director of R&D, and his role was to funnel "R&D spend" back to Ginkgo; (iv) Ginkgo locked Motif

FoodWorks into non-refundable long-term prepaid services contracts making it financially impracticable for Motif FoodWorks to utilize other providers and (v) Ginkgo executives discussed in the press the development activities they were conducting for Motif FoodWorks; (b) the statements omitted that the breakthrough purportedly accomplished for Motif FoodWorks was the result of stealing the patented invention owned by Impossible Foods, not merely by "Leveraging our Codebase and Foundry."

54.    Defendants also included a chart in their Defective Proxy/Registration Statement that claimed receipt of "highly predictable," "upfront" revenue:



Figure 12: Ginkgo generates economics from programs in two primary ways. First, customers pay upfront fees to cover initial R&D costs for a program. Second, Ginkgo shares in the downstream value (typically in the form of a royalty stream or equity share) generated by programs.

55.    The Defective Proxy/Registration Statement text and depiction identified in Paragraph 54 above were materially false and misleading when made because: (a) customers routinely did not "first" pay "upfront fees," but rather, as illustrated in the case of Synlogic, Ginkgo or Ginkgo's investors themselves first provided the funds from which the related-party customers would recycle back to Ginkgo; and (b) the fees were not "highly predictable" and did not provide a "predictable revenue stream" but instead as an article published only two weeks after the Defective Proxy/Registration Statement revealed, customers including Motif FoodWorks had raised concerns to Defendant Kelly about the "***unpredictable way*** Ginkgo was expending the foundry credits" and Synlogic's CEO characterized Ginkgo's accounting of services as "loosey-goosey."[1]  *See* Paragraph

---

[1] Unless otherwise noted, all emphasis herein is supplied.

86 below.

56.    The Defective Proxy/Registration Statement contained the following additional statements mischaracterizing Ginkgo's foundry revenue stream:

> We estimate that the unit costs of our Foundry cell engineering services are several times less expensive on average than the status quo (a customer doing equivalent R&D in-house, by-hand) and we expect that cost advantage to grow over time. We typically earn revenue tied to the units of work that we perform on behalf of our customers' programs. Initially, as we were building and validating the platform, these revenue covered less than 20% of the costs incurred to execute a program as the platform was less efficient than the status quo. As our platform has matured and efficiency improved, we have steadily increased the portion of program R&D costs that are covered upfront by customers and we now expect that new programs are structured to fully cover our direct costs, which will eventually enable us to earn a modest margin. ***Our Foundry revenue provides a strong foundation of predictable revenue that is independent of any commercialization efforts by our partners.***

57.    The statements identified in Paragraph 56 above were materially false and misleading when made because the foundry revenue was: (a) largely funded by circular payments originating from Ginkgo itself and/or Ginkgo's major investors, and thus was not "a strong foundation…independent of any commercialization efforts by our partners"; (b) was not predictable revenue for the reasons identified in Paragraph 55 above; and (c) Ginkgo's foundry programs were not structured to cover costs but rather to manufacture revenue using Ginkgo's own money and the funds of its investors.

58.    With respect to Synlogic, the Defective Proxy/Registration Statement reported its deferred revenue liability to Synlogic as only $72 thousand, and stated the following:

> In June 2019, the Company entered into several agreements with Synlogic, a publicly traded clinical-stage biopharmaceutical company focused on advancing drug discovery and development for synthetic biology-derived medicines. The Company entered into a Subscription Agreement with Synlogic whereby it purchased 6,340,771 shares of common stock at $9.00 per share for a total purchase price of $57.1 million, which represented a 19.9% equity interest in Synlogic. The Company also entered into a Warrant Agreement whereby it received the right to purchase 2,548,117 shares of common stock of Synlogic at an exercise price of $9.00 per share. The Company made a non-refundable prepayment related to the exercise price of the warrant equal to $8.99 per share for a total payment of $22.9 million. The warrant is only exercisable to the extent the Company's interest in Synlogic does not exceed 19.99%. The Company also entered into a Foundry Services Agreement ("Synlogic FSA") whereby Synlogic provided $30.0 million in cash as a non-refundable prepayment for Foundry services. The prepaid Foundry services can be utilized for development of

collaboration strains. Services performed under the services agreement will be applied to the prepaid amount based on the contractual rates included in the contract, based on costs incurred plus a fixed margin. Work will be performed under the Synlogic FSA pursuant to TDPs. Each TDP will pursue the development of a specific collaboration strain and/or production protocol. The Synlogic FSA will terminate upon the earlier of the exhaustion of the prepayment amount in full or the fifth anniversary of the effective date of the agreement and may be extended in certain circumstances.

59.    The statements identified in Paragraph 58 above were materially false and misleading when made because they omitted that: (a) the $30 million that Synlogic purportedly "provided . . . in cash as a non-refundable prepayment for Foundry services" was in fact simply the recycling of an overpayment that Ginkgo provided to Synlogic when purchasing Synlogic shares and warrants at rates well above market value, such that Ginkgo was effectively paying itself; (b) that Ginkgo still owed Synlogic approximately $13.6 million in unfulfilled prepaid services, not $72 thousand; and (c) that the organisms Ginkgo helped engineer were not successful and failed to meet specified criteria, leading Synlogic to hire Ginkgo competitor Zymergen even though Ginkgo still owed it approximately $13.6 million in prepaid services.

60.    In describing its revenue from related parties, the Defective Proxy/Registration Statement claimed that Synlogic accounted for only $73 thousand of related-party revenue in 2020 and only $17 thousand of related-party revenue in 2019.  These statements were materially false and misleading when made because Synlogic indicated that it actually expended $16.4 million in prepaid services with Ginkgo in 2019 and 2020, ***all of which were pursuant to related-party transactions***.

61.    With respect to related-party Allonnia, the Defective Proxy/Registration Statement claimed that Ginkgo does not control Allonnia overall, and "is not the primary beneficiary of Allonnia as it does not control the decisions that most significantly impact Allonnia's economic performance," including "development activities."   The Defective Proxy/Registration Statement also stated that Ginkgo entered into a Technical Development Agreement with Allonnia under which we provide R&D services in return for ***cash consideration*** on a cost-plus fixed margin basis," and said that Allonnia generated revenue for Ginkgo of $4.96 million in 2021 and almost $2.3 million in the first quarter of 2021 alone – a $9 million annual run rate.

62.    The statements identified in Paragraph 61 above were materially false and misleading

when made because: (a) Ginkgo did exercise substantial control over Allonnia; (b) they omitted that Allonnia's managers included Ginkgo executives Kelly and Kakoyiannis, and that Allonnia listed its mailing address as "c/o Ginkgo Bioworks" in regulatory filings; and (c) Allonnia only had a handful of actual employees, inconsistent with the several million dollars of services that Ginkgo claimed that Allonnia generated.

63.     With respect to transparency of operations, the Defective Proxy/Registration Statement stated: "Our culture is built on care, transparency, diversity, employee ownership and engagement, and a deep, humble respect for biology.  Transparency is essential to how we operate, to enable sharing of the insights and tools that enable our platform to grow, as well as to build trust and accountability with all of our stakeholders."  This statement was materially false and misleading when made because Ginkgo was not transparent with investors about its related-party transactions, its circular accounting, the value provided to related-party clients, or in the case of Ginkgo's work for Motif FoodWorks, patent infringement.

64.     With respect to related party Kalo Ingredients, the Defective Proxy/Registration Statement claimed that the "relationship with Kalo is a vendor-customer relationship" and that Kalo Ingredients had generated a $11.9 million deferred revenue balance with Ginkgo by March 31, 2021. These statements were materially false and/or misleading when made because: (a) Kalo is a controlled party reliant upon and dominated by Ginkgo, who had three Ginkgo executives listed as Kalo's "managers" and also has contractual rights beyond that to jointly steer development, and because Kalo worked out of Ginkgo's 27 Drydock building; and (b) the claimed $11.9 million deferred revenue balance claimed is inconsistent with the fact that Kalo was formed only 16 days earlier, and according to its LinkedIn page had no employees at the time.

65.     With respect to Cronos, the Defective Proxy/Registration Statement touted that Ginkgo was "supporting Cronos in their effort to biosynthesize cannabinoids," and discussed various details of the program but omitted the most important information: that Cronos considered the license it acquired from Ginkgo to be impaired, indicating that the program was not progressing as planned.  As a result of this omission, the statements were materially misleading when made.

66.     The Defective Proxy/Registration Statement also omitted material information it was

required to include under Items 303 and 503 of SEC Regulation S-K (17 C.F.R. §§229.303, 229.503). Item 303 requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's financial condition.   SEC Regulation S-K required Defendants to describe, in the Registration Statement as well as all SEC filings and investor communications during the Class Period, "material cash requirements from known contractual and other obligations.   Such disclosures must specify the type of obligation and the relevant time period for the related cash requirement." 17 C.F.R. §229.303(b)(1).   Item 303 also requires the disclosure of: "any known trends or any known demands, commitments, events, or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and…the extent to which income was so affected"; and "any known  trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

67.     The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.

68.     By omitting to disclose their unfulfilled contractual obligations to Synlogic, the actual nature of related-party transactions as alleged herein, and their actual lack of success in the programs they operated for Synlogic and other related parties, Registration Statement Defendants violated affirmative disclosure obligations under Item 303 of Regulation S-K.

69.     Item 503 requires disclosure of "the most significant factors that make the offering speculative or risky."   Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately

describes the risk."  By failing to describe the risk to Ginkgo's operations if Ginkgo and its investor ceased propping up revenue using circular flows from investments in related parties, and by failing to acknowledge at all the risks attendant from the patent infringement used to generate deliverables for Motif FoodWorks, Registration Statement Defendants violated affirmative disclosure obligations under Item 503 of Regulation S-K.

70.     Other statements which were filed with the SEC on Form 425s referencing and incorporated into the Defective Proxy/Registration Statement were also materially false and/or misleading.  For example, on May 11, 2021, on a conference call announcing the SPAC merger, the transcript of which was filed that day on Form 425, Defendant Kelly encouraged investors to draw a parallel between the work that Ginkgo did for Motif FoodWorks, and the plant-based food breakthroughs already achieved by Impossible Foods:

> **Jason Kelly:**
>
> so if you're familiar with Impossible Foods, if you've ever had a bite into an Impossible Burger, it's a veggie burger. You bite into it, and it bleeds. That's a bit weird, right? There's not a lot of blood in plants. So where are they getting that from? So what they've done is they found the gene for hemoglobin, which is what makes blood red. It's a protein, and then they took brewer's yeast, the kind of yeast you would use to make beer. They take that DNA code of the hemoglobin. They put it into the yeast. They brew it up in, effectively, a brewery. Instead of beer coming out of it, hemoglobin comes out. Then they add that back into a burger, and suddenly it smells right and tastes right and cooks right. It's the Impossible Whopper at Burger King nationwide in the US, right? That is, in my view, the first really, truly disruptive product in the beef space in probably 100 years, enabled by at the back end a cell program that is producing a magical ingredient in there that gives that burger its meaty taste, right? So Motif wants to do a similar thing. They want to pursue a whole range of different animal proteins that otherwise wouldn't be available in plants and then make those available to food developers so that we can have more Impossible Burgers. So they came to us with that spec. "Get me a yeast that produces these animal proteins.

71.     The statements identified in Paragraph 70 were materially false and misleading when made because it was Impossible Foods, not Ginkgo, that invented the process of synthesizing heme proteins using yeast, and Ginkgo simply stole its patented invention.

72.      On May 26, 2021, Defendant Wagner spoke at a UBS Healthcare Conference, the transcript of which was filed on Form 425 on May 27, 2021.  At the conference, Wagner made the following misleading statements regarding its research on behalf of Motif and Kalo:

**Anna Marie Wagner:**

. . . we've now engineered some fungal strains that are just really efficient protein producers. Which is important for applications where you need a lot of protein. So food, maybe personal care products, things like that. Less important for something like a therapeutic where you might get some low volume requirements and high price. But for these more mass applications, you need really efficient production strains**.** ***And so we've developed a really great host for producing proteins on behalf of Motif which is doing food ingredients and now we have a new company that's launching on the platform, Kalo, which is making personal care proteins.*** They'll be able to leverage that strain which shaves a lot of time off the development cycle because we're not starting from scratch the way that Kalo would have had to start from scratch if they were just launching on their own, which is really the status quo. That's how most companies are getting started these days.

73.     The statements identified in Paragraph 72 were materially false and/or misleading when made because Ginkgo had not "developed a really great host for producing proteins on behalf of Motif," and instead had utilized an invention already patented by Impossible Foods, (b) the Codebase was not a "powerful asset[]", as it failed to produce a protein that Motif FoodWorks could reliably use without infringing on Impossible Foods' patent, and (c) they failed to disclose that Kalo Ingredients and Motif FoodWorks were created by Ginkgo to serve as Ginkgo's customers, rather than being new companies that sought Ginkgo's business.

74.     On August 18, 2021, Ginkgo provided a "Half Year Update" to investors and filed a transcript of the presentation on Form 425 on August 20, 2021.  Defendant Kelly made the following statement about its customer Motif FoodWorks:

**Jason Kelly:**

Next slide. ***Our third case, Motif Food Works. So this one is really exciting to me, and it's a big part of the reason you're seeing all the inbound interests that I mentioned earlier for our new programs at Ginkgo. So what's exciting about Motif is this is a brand new company back in 2018 when it got started. And so they built themselves from day one on top of Ginkgo's platform.*** In other words, it's not like Biogen where I'm convincing them to migrate some work they're doing at their own lab to Ginkgo. Motif was able to never spend a dime building out biotechnology lab equipment. . . .

75.     The statements identified in Paragraph 74 above were materially false and/or misleading when made because: (a) Motif FoodWorks actually built themselves upon Impossible Foods' patented invention, and Ginkgo facilitated that process; (b) the statements omitted that Motif

FoodWorks had infringed upon Impossible Foods' patented invention; and (c) they failed to disclose that Motif FoodWorks was created by Ginkgo to serve as Ginkgo's customer, rather than being a company that chose to "buil[d] themselves from day one on Ginkgo's platform."

76.     On August 23, 2021, Ginkgo issued a press release about Cronos that it filed on Form 425 on that same date.  The press release and Form 425 boasted that the collaboration achieved a productivity target, and quoted Defendant Kelly as stating: "Cell programming can enable access to rare and important molecules found in nature, such as cannabinoids."

77.     The statements identified in Paragraph 76 above were materially misleading when made because they omitted that Cronos' license to utilize the referenced cell programming and resulting synthetic cannabinoid was actually impaired at the time, as would be subsequently disclosed by Cronos (but never by Ginkgo).

78.     On September 9, 2021, Defendant Wagner spoke at a Healthcare Conference sponsored by Morgan Stanley and Ginkgo filed a transcript of the presentation on Form 425 on September 13, 2021.  Wagner made the following statement about Ginkgo's relationship with Motif FoodWorks:

> **Anna Marie Wagner:**
>
> The fastest growth sectors of the food industry today are people like Impossible Foods, right, or Motif, which is a company that launched on Ginkgo's platform that just raised a massive Series B. So, these are companies that are fundamentally disrupting their industries with very high value products.

79.     The statements identified in Paragraph 78 were materially false and/or misleading when made for the same reasons as identified in Paragraph 73 and because they failed to disclose that Motif FoodWorks was not disrupting its industry but had simply stolen the invention of the industry disruptor, Impossible Foods.

80.     On September 10, 2021, Defendant Wagner spoke at a Wells Fargo Healthcare Conference, and Ginkgo filed a transcript of the presentation on Form 425 on September 14, 2021. Defendant Wagner made the following statements about how Ginkgo receives revenue from its customers:

AMENDED COMPLAINT
Case No. 4:21-cv-08943-KAW              23

**Dan Leonard:**

Okay. You must be doing NPV analysis on these things prior to striking up the relationship with Aldevron, right? Because you've got to commit resources to it. Is there a certain threshold that somebody has to clear in your internal analysis before you commit resources to a program?

**Anna Marie Wagner:**

There is, but I would say that that threshold is much more likely to be determined by our customer than by Ginkgo. ***Because remember, the customer is actually paying for the R&D work. And so, the customer is going to choose to pay Ginkgo $5 million or $10 million to do an R&D project for them***. They'd better be pretty darn sure that that product is going to pay off. So, there's an underwriting that happens there by the customer. It's not that Ginkgo is deciding to spend $10 million on a product. We're choosing to utilize our capacity for that revenue stream, but we're getting paid. Our investment is getting de-risked, and so we just want to make sure we're getting the appropriate share of every program that's running through the platform and that we're getting appropriately compensated for the value that we're driving.

81. The statements identified in Paragraph 80 were materially false and/or misleading when made when because they failed to disclose that Ginkgo and/or Ginkgo's principal investors, rather than the customer, "actually pay[]" for the R&D work via a circular funding arrangement; (b) by offering customers multimillion dollar R&D credits, Ginkgo is in effect "deciding to spend $10 million on a product"; and (c) because its customers were overwhelmingly related parties, Ginkgo's investments were not "de-risked."

## IV. Shareholders Approve the Merger and Complete Ginkgo's IPO Via the Defective Proxy/Registration Statement

82. Having only available the materially false and misleading information contained in the Defective Proxy/Registration Statement, shareholders overwhelmingly approved the merger, thereby effecting the IPO of Ginkgo. Ginkgo's September 14, 2021 press release described the transaction as "the largest-ever biotechnology go-public transaction."

83. According to reports, more than half of SRNG shareholders opted to retain shares in the merged Company rather than redeem for $10/share, as they were entitled to do. As a result, $858 million remained in the trust fund at closing, allowing (in combination with PIPE financing) for the minimum cash contingency to be satisfied. *See* https://spacinsider.com/2021/09/14/soaring-eagle-shareholders-approve-ginko-bioworks-deal/.

1

**V.**     **Third Parties Disclose Material Information Omitted or Misstated in the Defective Proxy/Registration Statement**

2

3          84.     On August 24, 2021, MIT Technology Review published an article suggesting that

4    some of the hype contained in the Defective Proxy/Registration Statement might be unwarranted.  In

5    particular, it noted that the Synlogic transaction essentially amounted to a "round trip" transaction,

6    "starting as cash in Ginkgo's bank account and ending up as payment for foundry services," and that

7    Ginkgo's strains were not successful:

8              But the way the deal was structured, it was Ginkgo that ended up paying
               for most of the R&D, not Synlogic. As part of the agreement, Synlogic
9              did cut a check for $30 million in cash to Ginkgo for foundry services
               aimed at improving its strains. But Ginkgo simultaneously invested $80
10             million in Synlogic at a sizable premium to its stock price at the time.
               In effect, the money took a round trip, starting as cash in Ginkgo's bank
11             account and ending up as payment for foundry services. . . .

12             Indeed, the particular organisms Ginkgo helped engineer were not
               successful after they failed to "reach our criteria to advance the project"
13             into clinical testing, Brennan says. Instead, this summer Synlogic
               announced it would begin human tests of a new version of its E. coli
14             engineered by enEvolv, a startup recently purchased by Zymergen,
               which she says brought capabilities to the project that Ginkgo did not
15             have at the time.

16   *See*     https://www.technologyreview.com/2021/08/24/1032308/is-ginkgos-synthetic-biology-story-
     worth-15-billion/.

17         85.     The MIT Technology Review article also emphasized Ginkgo's unnatural relationship

18   with Viking Global:

19             For instance, Kelly, along with his company's largest outside investor,
               Viking Global (it owns 20% of Ginkgo), came to the financial aid of
20             Genomatica, a company making plastic precursors and facing a costly
               push to commercialization. That company wound up largely owned by
21             Viking and Ginkgo, while also becoming one of Ginkgo's customers. A
               person formerly close to Genomatica described ***Ginkgo as acting as "an
22             arm of Viking" whose true business could be described as financial
               engineering, not genetic engineering.***

23         86.     The MIT Technology Review article also contained a quote from Synlogic's CEO,

24   Aoife Brennan, describing Ginkgo's accounting of the services it billed to Synlogic as "loosey-

25   goosey," and an admission by Defendant Kelly that foundry billings were unpredictable, the exact

26   opposite of what he said in the Defective Proxy/Registration Statement:

27             Kelly confirmed that some of the CEOs of Ginkgo's partners, including
               the head of Motif, raised concerns to him about the unpredictable way
28

Ginkgo was expending the foundry credits they'd been awarded. Basically, Ginkgo was dividing the cost of running its foundry between whatever customers it happened to have, rather than billing them at fixed rates, which it does now. Brennan says the "loosey-goosey" accounting created challenges for her company, which is public already and had to file quarterly reports with the US Securities and Exchange Commission.

87. On October 6, 2021, market researcher Scorpion Capital released a 175-page report ("Scorpion Report") alleging that Ginkgo is a "colossal scam," and describing the Company as a "shell game" whose revenue is highly dependent on related party transactions. *See* https://scorpioncapital.s3.us-east-2.amazonaws.com/reports/DNA1.pdf. The report alleges that Ginkgo is a "Frankenstein mash-up of the worst frauds of the last 20 years" and "one of the most brazen frauds of the last 20 years." On that same day Citron Research also came out with an article corroborating the factual findings in Scorpion's report, stating: "we've too checked with DNA former employees and we don't think Scorpion is missing anything there." *See* https://citronresearch.com/wp-content/uploads/2021/10/Ginkgo-Bioworks-Its-not-a-scam-its-a-scheme.pdf.

88. The report was based on an "intensive investigation into Ginkgo's business model and practices, with a particular focus on the related-party entities that drive the bulk of its revenue." As part of this investigation, Scorpion Capital "completed 21 research interviews, encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related-party 'customers.'"

89. The Scorpion Report stated the following, in pertinent part, about related party transactions:

. . . The majority of [Ginkgo's] foundry revenue, an absurd 72% in 2020, and essentially 100% of its deferred revenue are derived from related-party "customers" it created, funded, controls, or influences via its ownership position and board seats. ***Investments into these entities by Ginkgo and its largest investors are recycled back to Ginkgo and recorded as deferred or current revenue.*** The scheme reflects its woeful, decade-long failure to derive real revenue from third-party customers, forcing it to cover it up with a ploy that we believe to be enabled by its largest holders. . . .

***[R]elated party revenue . . . is far greater than it reports.*** We have uncovered a smoking gun that indicates that essentially ALL of its foundry revenue is derived from related parties, suggesting that Ginkgo

has engaged in a brazen effort to misclassify and misreport related party revenue and deceive investors with phony accounting.

. . . Ginkgo is opaque about the percent of its revenue and deferred revenue which is cash versus non-cash. Based on interviews with its related-party "customers," we believe that at least half of Ginkgo's reported foundry revenue is phantom – that is, non-cash and pure accounting hocus-pocus. We spoke with one of its largest such customers, from whom Ginkgo reported $38MM and $30MM of deferred revenue in 2019 and 2020. A senior employee there stated unequivocally that they have never paid Ginkgo cash for foundry services and are merely using "free" R&D credits following investments by Ginkgo and Viking. Giving away the essence of the scam, *the customer stated they would not use Ginkgo if they had to pay cash, dismissing them as a failed contract research organization (CRO) that they neither trust to deliver nor could justify except under a round-tripping deal.*

90.     The Scorpion Report also disclosed that many of the related parties identified in the Defective Proxy/Registration Statement were in fact fronts, or at the very least were largely illusory companies that lacked operations sufficient to require the amount of services that Defendants claimed that such companies had prepaid, or contracted for:

The related party "customers" are mostly fronts for Ginkgo and its revenue is therefore an elaborate fiction.   The entities are generally small, failed projects that share the following features: 1) based inside Ginkgo's headquarters; 2) have vaporous, glossy, Instagram-like websites that appear to be operated by Ginkgo; 3) have too few employees on LinkedIn to drive the "revenue" that Ginkgo books from them, and in some cases appear to have no employees at all; 4) appear to be controlled and run by Ginkgo, as the entities typically lack finance, treasury, or HR employees, indicating they are neither designed to nor actually operate independently; and 5) appear to be further controlled via "G&A Services Agreements" that suggest Ginkgo runs them.

(Emphasis in original).

91.     The Scorpion Report also revealed *how* related-party prepayments were used to inflate Ginkgo's financials:

The haste with which related parties recycle proceeds back to Ginkgo is startling.  In virtually every case, Ginkgo and its investors inject cash into the related party, followed by Ginkgo immediately booking large chunks of revenue and deferred revenue.  We believe this serves several purposes, beyond just conjuring revenue from thin air: it creates a deferred revenue slush fund that enables Ginkgo to create quarterly accounting revenue at will, versus being dependent on the entity's R&D spend; it gets Ginkgo's hands back on its cash instantly, lest the related party ever have second thoughts about using Ginkgo's foundry services (a recurring source of tension with some related parties, which we discuss later); and it enables Ginkgo to create a false investor narrative

around a deferred revenue backlog.

(Emphasis in original).

92.     The Scorpion Report also noted that the size of prepayments made by related parties further separated the "round trip" transactions from "legitimate vendor-customer transaction[s]": "Ginkgo invested $80MM in its related party Synlogic, but took $30MM out at closing – a prepayment for five years of R&D spend.  In a legitimate vendor-customer transaction, no customer would ever pre-pay five years of R&D spend."  Corroborating the conclusions of the Scorpion Report, Ginkgo has failed to identify even a single nonrelated-party customer that prepaid five years of R&D spend.

93.     The Scorpion Report revealed that nonrelated-party Foundry revenue was likely close to zero, not the 30-40% claimed in the Defective Proxy/Registration Statement:

> <u>We believe the actual [related-party percentage of foundry revenue] figure is essentially 100%, and think that Ginkgo is misclassifying and underreporting related party revenue</u>. While the reported 60-70% percentage is bad enough . . . it's still better than 100%.  Ginkgo can claim that at least 30-40% of foundry revenue comes from [unrelated] third parties, and   that its reliance decreased in Q1 2021 to "only" 56%.

(Emphasis in original).  In particular, the Scorpion Report noted that Ginkgo only classified $73 thousand of revenue in 2020, and $72 thousand of deferred revenue as of December 31, 2020 from Synlogic as "related party," whereas Synlogic separately reported that it expended $13.6 million of pre-paid credits in 2020, an expenditure which appeared in Synlogic's SEC filing but not in the Defective Proxy/Registration Statement.  The Scorpion Report also revealed that a Synlogic executive stated that the small amount of related-party revenue listed in the Defective Proxy/Registration Statemen "doesn't sound accurate."   As the Scorpion Report revealed, had Synlogic's 2020 related-party expenditures with Ginkgo been classified as related-party revenue, the related party revenue as a percentage of reported foundry revenue was 95%, not 72% as reported in the Defective Proxy/Registration Statement:

|                   | As reported | As recalculated |
|-------------------|-------------|-----------------|
| Nonrelated-Party  | **28%**     | **5%**          |
| Related-Party     | **72%**     | **95%**         |

94.     The Scorpion Report further revealed that the so-called related parties did not function

as independent entities.  For example, Allonnia, Kalo Ingredients, Joyn Bio, and Motif FoodWorks all worked out of the same Boston office building (27 Drydock) as Ginkgo, and many even listed Ginkgo's phone number as their own.  Moreover, Ginkgo's top three investors (Viking Global, Cascade and General Atlantic) often propped up the related-party ventures that were Ginkgo's largest customers.  And, many Ginkgo employees rotated among the related-party companies to make sure they all continued to play ball with Ginkgo.  For example, it explained that Dayal Saran, a program director at Ginkgo, became Head of R&D Alliance at Motif, Head of Synthetic Biology at Synlogic, and Vice President of Research at Allonnia.

95.    About related-party company Kalo Ingredients, the Scorpion Report disclosed that Kalo Ingredients made a filing with the Massachusetts Division of Corporations confirming: (a) that it was formed on March 15, 2021, only 16 days before it supposedly had a $11.9M deferred revenue balance with Ginkgo, according to the Defective Proxy/Registration Statement; (b) that Kalo Ingredients' LinkedIn page said that it had no employees at the time; (c) that its regulatory filing listed Ginkgo's office as its "principal office" and listed Ginkgo itself as its agent; (d) that its regulatory filing listed three Ginkgo officers and employees, including Defendant Kelly, as Kalo Ingredients' managers:



96.    Plaintiff has corroborated the information described in the Scorpion Report regarding

1  the alleged regulatory filing with the Massachusetts Secretary of State Corporations Division.  Plaintiff
2  has also corroborated that each of the "Managers" listed above of Kalo Ingredients was in fact
3  employed by Ginkgo.  Indeed, Jasmina Aganovic lists on her LinkedIn page that she was with Ginkgo
4  until July 2021, and did not start working for Kalo Ingredients (now known as Arcaea) until July 2021.

5       97.    About related party Allonnia, the Scorpion Report revealed that in contrast to the
6  Defective Proxy/Registration Statement assertion that Ginkgo "entered into a Technical Development
7  Agreement with Allonnia under which we provide R&D services in return for **cash consideration** on
8  a cost-plus fixed margin basis," Allonnia's financial statements suggest that it made little or no cash
9  payments to Ginkgo.  The Scorpion Report revealed that Allonnia's filings with the Massachusetts
10  Secretary of State Corporations Division listed its principal office as being in "c/o Ginkgo Bioworks"
11  at Ginkgo's 27 Drydock corporate headquarters, and stated that its managers included Defendant Kelly
12  and Ginkgo's Head of Ventures, Jason Kakoyiannis.  Plaintiff has corroborated these filings.  The
13  Scorpion Report further explained that Ginkgo's claimed revenue from Allonnia of $4.96 million in
14  2020 and almost $2.3 million in the first quarter of 2021 alone were highly implausible given that
15  Allonnia only had 6 employees at the time, suggesting that "they are simply sham transactions."

16       98.    About related party Genomatica, the Scorpion Report disclosed that "Genomatica
17  appears to have been <u>equitized in 2016 and 2018 with a Series A and Series B</u> Preferred financing,
18  respectively.  The timing is opaque given Ginkgo's lack of disclosure.  Nonetheless, Ginkgo discloses
19  a carrying value at cost of $55MM in Genomatica's preferred stock, which we suspect closed in 2018.
20  <u>By 2019, Ginkgo already booked $44MM of revenue and deferred revenue</u> [from Genomatica]."
21  (Emphasis in original).

22       99.    About related party Joyn Bio, the Scorpion Report disclosed that Joyn Bio lists
23  Ginkgo's 27 Drydock address as its own on regulatory filings with the Massachusetts Secretary of
24  State Corporations Division, and lists Defendants Kelly and Shetty as managers.  Plaintiff has
25  corroborated these assertions with the Massachusetts Secretary of State Corporations Division.  The
26  Scorpion Report indicated that ex-employees of Ginkgo described the day-to-day operations of Joyn
27  Bio as "more like a subsidiary of Ginkgo or captive team within the company."  The Scorpion Report
28  also disclosed that this control enabled Ginkgo to charge Joyn much more than what comparable

vendors charged for comparable services, quoting from an interview with a Joyn Bio employee who revealed that: "Ginkgo wasn't being very transparent about how they were charging and what they were charging us for and why everything was costing as much as it was. . . . We have a vendor who charges us about $840 for a small fermentation vessel. And Ginkgo charges us between $1400 and $1500 for the same sized fermentation" but "we still have to play ball."

100.    About related party Motif FoodWorks, the Scorpion Report revealed that according to a Motif executive, Ginkgo embedded a Ginkgo employee as Motif's Director of R&D, and his role was to funnel "R&D spend" back to Ginkgo. It further revealed that Motif was lodged within Ginkgo's 27 Drydock Boston headquarters. Plaintiff has corroborated that filings with the Massachusetts Secretary of State Corporations Division list Ginkgo's headquarters as the principal office of Motif, that Defendant Shetty is listed as the corporate agent of Motif, and that Defendant Kelly and Ginkgo Head of Ventures Jason Kakoyiannis are listed as directors of Motif. As a result of these influences, the Scorpion Report indicated that Ginkgo was able to charge Motif significantly more for strain engineering than comparable vendors charged.

101.    The Scorpion Report also concluded that "at least half of Ginkgo's reported revenue is phantom – that is, non-cash and pure accounting hocus-pocus" (emphasis in original). Although the Scorpion Report noted that the determination was "difficult to answer" because Ginkgo's filings were "opaque" and its claimed revenue recognition policies were "impossible to decipher," it noted that the cash burn suggested that there was not meaningful cash coming in. As the Scorpion Report emphasized, this raised questions not only about Ginkgo's ability to generate cash flow going forward, but also whether customers would have been willing to pay for its services had they been required to pay cash. In particular, the Scorpion Report quotes a senior Genomatica executive as conceding that Genomatica gave no cash to Ginkgo and that Genomatica was simply using "a bank of credits . . . that we need to spend." The same executive admitted that Genomatica would not have made the same expenditures with Ginkgo if required to pay cash, because "we would have a hard time justifying that."

102.    The Scorpion Report also disclosed that it was told by several partners and insiders that Ginkgo had no unique technical advantages over other contract research organizations ("CROs") that modified yeast strains:

*Senior employee at related-party "customer" Joyn Bio calls them "a kind of a glorified CRO"*
*"They can engineer a strain and test them with very high throughput. But how we are working with them now is as a kind of a glorified CRO."* – *Senior employee at Joyn*

*Ex-employee in a managerial role states Ginkgo has no unique equipment or "any really unique IP"*
*"On a high level, I don't think they're unique and special at all…it doesn't have any unique equipment. I don't think it has any really unique IP." - Former employee in a managerial role*

*Ex-executive stated foundry is "not unique"; just standard small molecule screens people have done for years*
*"The foundry itself is not unique. People for many years, whether that's Amyris or Intrexon or name your favorite pharma company, people have been doing small molecule screens and high throughput and doing similar types of work for many years."- Former executive*

*Second Joyn Bio source, an executive, can't point to anything different at Ginkgo's foundry*
*Q: "The foundry services that Ginkgo provides, are these are basically services you can get from a lot of other people?"*
*A: "Yeah, I would say there's probably—it would be hard for me to point to something that they do that is totally different than anybody else in the industry."*
*Q: "That doesn't bode well in the valuation."*
*A: "No comment." – Current Joyn executive*

(Emphasis in original).

103.    The Scorpion Report also revealed that so-called "BioSecurity" revenue was just short-term COVID PCR testing on standard Illumina equipment:

*"In 2020, we incurred significant operating and capital expenditures in launching our biosecurity offering, which includes COVID-19 testing products…" – SPAC prospectus*

*Covid-related revenue is unsustainable and testing is a commodity*
*"Covid testing was also just a ploy to get into pharma because for years they've tried to get into pharma and nobody wanted to work with them. It's still just like a commodity business that they're in, sort of NGS of viral samples; it's like the Quest Diagnostics and all these other labs, it's a race to the bottom for pricing and things like that. They've got some inflated revenues or short-term revenues but I don't see that as building long-term value ." –Former director-level employee*

*"Nothing special"*
*"I don't even know why Ginkgo is doing Covid-19 testing. PCR testing, you can do that at any university lab, really at any company. It just requires a couple of DNA sequencers, I mean, Illumina instruments, nothing special." – Former employee in a managerial role*

(Emphasis in original).

104.    On February 18, 2022, Cronos filed a Form 10-Q disclosing that its collaboration license with Ginkgo had become impaired during the Third Quarter of 2021, *i.e.*, at the exact time that Ginkgo announced in a press release/Form 425 that it had achieved productivity targets with Cronos in its partnership to produce eight cultured cannabinoids.

105.    On March 9, 2022, Impossible Foods sued Motif FoodWorks in a lawsuit revealing that the breakthrough that Ginkgo claimed to have achieved for Motif FoodWorks was, in fact, simply infringing the known and patented invention of Impossible Foods.  The lawsuit revealed that Impossible Foods had developed a vegan version of a protein called "heme," which is crucial to the feel, taste and texture of plant-based meat prior to the formation of Motif FoodWorks using "a proprietary strain of genetically modified Pichia yeast that produces LegH through a fermentation

1    process." According to the complaint, Motif FoodWorks copied its technology for imitating the taste

2    of real meat. *See Impossible Foods Inc. v. Motif Foodworks Inc.*, 22-cv-00311-CFC (D. Del.). The

3    complaint quoted Defendant Kelly encouraging the copying by stating Ginkgo would "brew the next

4    100 hemes so that we can see many more Impossible Burgers in the next few years."

5    **ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV and V**

6        106.    Section 10(b) Defendants Ginkgo, Kelly and Shetty had knowledge of the true facts

7    when they made the aforementioned misstatements to investors. First, they knew the actual nature of

8    the related-party relationships because they were involved in the conception and/or negotiation of

9    collaboration, partnership and investment agreements, all of which were signed by Defendant Kelly.

10   Second, Defendant Kelly served as a Manager or Director of Joyn Bio, Allonnia, Motif FoodWorks

11   and Kalo Ingredients, and Defendant Shetty served as Manager, Director, or Agent of Joyn Bio and

12   Motif FoodWorks.

13       107.    Confidential witnesses also confirmed that Defendants Shetty and Kelly were informed

14   about the misrepresented information. CW1 worked at Ginkgo out of its 27 Drydock Boston office

15   from 2018 until July 2021 as a Commercial Coordinator and reported directly to Chief Commercial

16   Officer Matthew McKnight. CW1 regularly attended meetings in which senior management discussed

17   revenue, credits, and the trajectory of funds. According to CW1, Defendant Shetty was informed

18   about all recorded revenue and revenue streams. CW1 said that Shetty was informed of everything

19   that went on in finance. CW1 also reported that multi-million dollar equipment would routinely go

20   unused at the Ginkgo Foundry. In CW1's view, Ginkgo engaged in these related party transactions to

21   create the sense that Ginkgo could do the work so that other companies would want to work with

22   Ginkgo.

23       108.    CW2 was employed by Ginkgo out of the 27 Drydock Boston facility from April 2017

24   to April 2020 as a Test Engineer and a Senior Test Engineer, and reported to Joaquim Marques, Head

25   of Analytical Chemistry. CW2 reported that Ginkgo worked on several projects involving related

26   parties for which failure had already been reported internally on interim reports, but that Ginkgo

27   continued working on the projects despite the failure already being documented. CW2 complained to

28   Alliance managers that Ginkgo does not make money providing services to these companies in the

Foundry.  CW2 also raised these concerns to senior management at weekly technical meetings where these interim reports were discussed (which were attended by Defendant Shetty), as well as at town hall meetings.

109.    Ginkgo was also aware that the opacity in its disclosures hindered even astute professional investors from meaningfully assessing its related-party deals.  At a September 15, 2021 Bernstein Securities conference, an analyst pointedly asked Defendant Wagner if the Company would provide more information so that analysts could accurately model those deals in analyzing Ginkgo. Bernstein refused, stating "…the number of programs we are working on in the platform is so broad, it's so diverse, that no analyst would be able to really underwrite each one of those programs individually."

110.    Throughout the Summer of 2021, Ginkgo continued to tout new relationships with undeveloped and often completely unknown companies.  Ginkgo announced "new partnerships," with eight new companies in August and September leading up to the opening of trading on September 17. One new partnership included Antheia, which Ginkgo touted in an August 12, 2021 Press Release as "at the cutting edge of synthetic biology innovation, and its whole-cell engineering platform is capable of producing entire classes of medicines that were previously inaccessible, . . . We are thrilled that Ginkgo's platform can support innovators like Antheia as they create next generation manufacturing technologies for essential medicines." Ginkgo did not disclose that Ginkgo's largest shareholder, Viking Global led the financing of Antheia, and Antheia was thus an undisclosed related party.

111.    On October 6, 2021, as a direct result of the disclosures made in the Scorpion Report, Ginkgo's shares fell $1.39 per share, or approximately 12%, to close at $10.59 per share on heavy volume, damaging investors.

**NO SAFE HARBOR**

112.    None of the aforementioned misrepresentations and omissions were protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), because they fell outside the scope of the safe harbor provision.

113.    Alternately, even if otherwise within the scope of the safe harbor provision, the identified misrepresentations and omissions were subject to an exception of the safe harbor provision.

According to the PSLRA, the safe harbor does not apply to statements made "in connection with an offering of securities by a blank check company," *see* 15 U.S.C. §78u-5(b)(1)(B) or was "made in connection with an initial public offering," *see* 15 U.S.C. §78u-5(b)(2)(D).   At the time that the Defective Proxy/Prospectus was filed, the issuer (Soaring Eagle) was a blank check company, as it admitted in its own Form S-1 filed on December 23, 2020.  Additionally, the statements were made in connection with the initial public offering of Ginkgo, which was effected by the Form S-4 and de-SPAC transaction with Soaring Eagle.  Indeed, Ginkgo's announcement that the merger was approved by shareholders confirmed was entitled "Ginkgo Bioworks to Go Public with Over $1.6 Billion in Proceeds."  *See* Press Release dated September 14, 2021, available at https://www.businesswire.com/news/home/20210914005748/en/Ginkgo-Bioworks-to-Go-Public-with-Over-1.6-Billion-in-Proceeds.

## CLASS ACTION ALLEGATIONS

114.   Plaintiff brings these claims individually and on behalf of three Classes:

a.   Securities Act Class: all persons who purchased or otherwise acquired shares in Ginkgo (including by way of exchange of SRNG shares) pursuant or traceable to the defective proxy/registration statement that Defendants filed with the SEC on Form S-4 on May 14, 2021, and that was thereafter amended on Forms S-4/A on June 28, 2021, July 16, 2021, August 4, 2021, and August 9, 2021.  The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act.  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

b.   14(a) Class: all persons who were solicited to approve the merger and to retain rather than redeem SRNG shares pursuant to the defective proxy/registration statement filed on Form S-4.  The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder.  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c.   10(b) Class: all persons who purchased or otherwise acquired in a public offering or on public markets securities of Ginkgo (including its predecessor SRNG) between May

11, 2021 and October 5, 2021, both dates inclusive (the "Class Period").  The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors of Ginkgo or SRNG; (c) any entity that has entered into a stockholders agreement or co-venture agreement with Ginkgo, or was a Private Investment in Public Equities ("PIPE") investor in Ginkgo; and (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

115.    The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of members of each Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Ginkgo disclosed in the first Form 10-K it filed with the SEC as a public company that there were 217 registered stockholders of record of Ginkgo's Class A Common Stock, "which does not include persons whose stock is held in nominee or 'street name' accounts through brokers, banks and intermediaries."  Based upon industry practice, Plaintiff believes that the overwhelming majority of publicly-held Ginkgo shares are held in street name.  Additionally, that more than one hundred million Soaring Eagle shares that became interests in the surviving company and were not redeemed pursuant to the Defective Proxy/Registration Statement, as well as the volume of shares traded thereafter on the NYSE further demonstrates that each Class contains numerous members.

116.    Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Classes are:

     a.  Whether Defendants made misrepresentations and/or omitted material information to investors in the Defective Proxy/Registration Statement;

     b.  Whether Defendants' misrepresentations and omissions violated federal securities laws;

     c.  Whether Defendants' misrepresentations and omissions were material;

     d.  [For the 10(b) Class only] Whether Defendants acted with scienter;

e.   [For the 10(b) Class only] Whether the prices of Ginkgo securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

f.   Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

117.   Plaintiff's claims are typical of the claims of the members of the Classes as all members of each Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

118.   Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has no interests antagonistic to the Classes, and has retained highly experienced counsel specializing in securities litigation.

119.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

120.   [Alleged only with respect to 10(b) Class] For the 10(b) Class, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   During the Class Period, Defendants made public misrepresentations of material facts and failed to disclose material facts necessary to make the statements they publicly made during the Class Period not misleading under the circumstances in which they were made;

b.   Company shares traded in an efficient market;

c.   Company shares were liquid and traded with heavy volume during the Class Period;

d.   Company shares traded on the Nasdaq and then NYSE, and the Company was covered by multiple analysts, journalists, and industry commentators;

e.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

f.   Plaintiff and members of the 10(b) Class purchased, acquired and/or sold Company shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

g.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

121.   [Alleged only with respect to 10(b) Class] Alternatively, Plaintiff and the members of the 10(b) Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I
### Violation of Section 11 of the Securities Act of 1933
### Against the Company and Registration Statement Defendants

122.   Plaintiff restates and realleges Paragraphs 1 through 105 and 112 through 121 as though fully set forth herein.

123.   This Count is based on negligence and strict liability and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

124.   This count is asserted against the Company and the Registration Statement Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and all members of the Class who purchased or otherwise acquired Ginkgo securities pursuant or traceable to the Defective Proxy/Registration Statement.

125.   The Company is the issuer of the stock issued via the Defective Proxy/Registration Statement.  As such, the Company is strictly liable for each false and misleading statement contained therein.

126.   Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller and Paul are signatories to the Defective Proxy/Registration Statement, and were directors of the Company at the time it was filed.  Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Registration Statement to ensure that said statements were true

1   and that there was no omission to state any material fact required to be stated in order to make the

2   statements contained therein not misleading.  In the exercise of reasonable care, these Defendants

3   should have known of the material misstatements and omissions contained in the Defective

4   Proxy/Registration Statement.  As such, each of these Defendants is liable to Plaintiff and the

5   Securities Act Class.

6   127.   Defendants Kelly, Shetty, Belldegrum, Dekkers, Henry, Kewalramani and Sankar were

7   named in the Defective Proxy/Registration Statement as persons who were about to become directors

8   in the merged Company, and consented to being so named.  Therefore, each of these Defendants had

9   a duty to make a reasonable investigation into the statements contained in the Registration Statement

10   to ensure that said statements were true and that there was no omission to state any material fact

11   required to be stated in order to make the statements contained therein not misleading.  In the exercise

12   of reasonable care, these Defendants should have known of the material misstatements and omissions

13   contained in the Defective Proxy/Registration Statement.  As such, each of these Defendants is liable

14   to Plaintiff and the Securities Act Class.

15   128.   Plaintiff and other members of the Securities Act Class acquired Ginkgo securities

16   without knowledge of the untruths and/or omissions alleged herein.  Plaintiff and the other members

17   of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

18   129.   This action was brought within one year after the discovery of the untrue statements

19   and omissions and within three years of the offering date.

20                           **COUNT II**
          **Violation of Section 15 of Securities Act of 1933**
21   **Against Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller and Paul**

22   130.   Plaintiff restates and realleges Paragraphs 1 through 105 and 112 through 121 as though

23   fully set forth herein.

24   131.   This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o,

25   against Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller and Paul.  These Defendants,

26   in addition to their own primary liability under the Securities Act, are also secondarily liable for the

27   primary violations of the Company.

28   132.   As directors of SRNG, and the overseers of the due diligence process, each was

involved with the day-to-day operations of the Company prior to the merger, and by virtue of being a signatory to the Defective Proxy/Registration Statement, each was a controlling person of the Company at the time the Defective Proxy/Registration Statement was issued. Each had the ability to control the contents thereof, including by refusing to sign until it was made accurate and not misleading.

133. Plaintiff and other members of the Securities Act Class acquired Ginkgo securities without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and their status as control persons of the Company, these Defendants are secondarily liable to Plaintiff and the Securities Act Class.

**COUNT III**
**Violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9**
**Against the Company and Defendants Sloan, Baker, Delman,**
**Kazam, Lee, Leiweke, Miller and Paul**

134. Plaintiff restates and realleges paragraphs 1 through 105 and 112 through 121 as though fully set forth herein.

135. This Count is asserted pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9 promulgated thereunder, against the Company and Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller and Paul does not sound in fraud. Plaintiff does not allege that Defendants had scienter or fraudulent intent with respect to this Count as they are not elements of a Section 14(a) claim.

136. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

137. These Defendants prepared, signed and disseminated the Defective Proxy/Registration

---

AMENDED COMPLAINT
Case No. 4:21-cv-08943-KAW          40

Statement, which as specified above made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

138.    By virtue of their positions within the pre-merger Company and their due diligence regarding Ginkgo and the merger, these Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Proxy/Registration Statement.  The Defective Proxy/Registration Statement was prepared, reviewed, and/or disseminated by the Defendants named herein.  It misrepresented and/or omitted material facts, as detailed above.  Defendants were at least negligent in filing the Defective Proxy/Registration Statement with these materially false and misleading statements.

139.    As a direct result of these Defendants' negligent preparation, review and dissemination of the Defective Proxy/Registration Statement, members of the 14(a) Class were precluded from exercising their right to seek redemption of their SRNG shares prior to the merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the merger.  The Defective Proxy/Registration Statement used to obtain shareholder approval of the merger deprived 14(a) Class members of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their SRNG shares.  At all times relevant to the dissemination of the Defective Proxy/Registration Statement, these Defendants were aware of and/or had access to the true facts concerning Ginkgo.  Thus, as a direct and proximate result of the dissemination of the Defective Proxy/Registration Statement that Defendants used to obtain shareholder approval of and thereby consummate the merger, the 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

140.    The omissions and false and misleading statements in the Defective Proxy/Registration Statement were material in that a reasonable stockholder would have considered them important in deciding how to vote on the merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

141.    As stated herein, the Defective Proxy/Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  It was an essential link in the consummation of the Merger.  These Defendants also failed to correct the Defective Proxy/Registration Statement prior to the merger and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

142.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT IV**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against the Company and Defendants Sloan, Kelly and Wagner**

143.    Plaintiff restates and realleges each and every Paragraph above as though fully set forth herein.

144.    During the Class Period, the Company, Sloan, Kelly and Wagner, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

145.    These Defendants acted with scienter in that they knew or deliberately disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to confidential

1  proprietary information concerning the Company and participated in the fraudulent scheme alleged

2  herein.

3      146.   Sloan spearheaded the merger on behalf of SRNG and Kelly spearheaded the merger

4  on behalf of Ginkgo.  Each had actual knowledge of the material omissions and/or the falsity of the

5  material statements set forth above, and intended to be deceitful, or, in the alternative, acted with

6  reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements

7  made by them or other Company personnel.

8      147.   As a result of the foregoing, the market price of Company securities was artificially

9  inflated during the Class Period.  Plaintiff and the other members of the 10(b) Class relied on the

10  statements described above and/or the integrity of the market price of Company securities during the

11  Class Period in purchasing Company securities at prices that were artificially inflated as a result of

12  these Defendants' false and misleading statements.

13      148.   Had Plaintiff and the other members of the 10(b) Class been aware that the market price

14  of the Company's securities had been artificially and falsely inflated by Defendants' misleading

15  statements and by the material adverse information which Defendants did not disclose, they would not

16  have purchased Company securities at the artificially inflated prices that they did, or at all.

17      149.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the

18  10(b) Class have suffered damages in an amount to be established at trial.

19      150.   By reason of the foregoing, these Defendants have violated Section 10(b) of the 1934

20  Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of

21  the 10(b) Class for substantial damages which they suffered in connection with their purchase of

22  Company securities during the Class Period.

23                              **COUNT V**
                  **Violation of Section 20(a) of the Exchange Act**
24                   **Against Defendants Kelly and Shetty**

25      151.   Plaintiff restates and realleges each and every Paragraph above as though fully set forth

26  herein.

27      152.   During the Class Period, Defendants Kelly and Shetty, as founders and senior

28  executives, exercised control over the day-to-day activities of Ginkgo and Defendant Wagner.

Because of their roles and responsibilities at Ginkgo, Kelly and Shetty knew the adverse non-public information concealed by Wagner's misleading statements.  Both exercised authority over her and had the capability to control the contents of the misrepresentations she made as alleged herein.

153.    Moreover, Kelly and Shetty were both founders and senior executives at Ginkgo, and both served as directors of Ginkgo both before and after the merger.  Because of their roles and responsibilities at Ginkgo, Kelly and Shetty knew the adverse non-public information concealed by the Company's misleading statements.  Both utilized this influence to take roles at related-party companies, and both used their influence to control the day-to-day operations of Ginkgo.

154.    Accordingly, both Kelly and Shetty are secondarily liable as control persons for the primary §10(b) violations of Ginkgo and Wagner, as alleged herein.  By reason of their senior management positions and/or being directors of the Company, these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  These Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

155.    Both also culpably participated in the misrepresentations to investors as alleged in Count IV.  Because of their positions of control and authority as senior officers, Kelly and Shetty were able to, and did, control the contents of their direct communications with investors, which the Company disseminated in the marketplace during the Class Period concerning the Company's operations.  Throughout the Class Period, Kelly and Shetty exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff and each Class, and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class compensatory damages;

C.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.     Awarding such other relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and each Class demand a trial by jury.

Dated: May 26, 2022

Respectfully submitted,

POMERANTZ LLP

By:   */s/ Joshua B. Silverman*
Joshua B. Silverman (*pro hac vice*)
Brian O'Connell (SBN 314318)
10 S. LaSalle St., Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
jbsilverman@pomlaw.com
boconnell@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff and the Proposed Classes*

**THE SCHALL LAW FIRM**
Brian Schall (SBN 290685)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff and the Proposed Classes*

1

**CERTIFICATE OF SERVICE**

2
     I hereby certify that on May 26, 2022, a copy of the foregoing was filed electronically via the

3
Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of

4
the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF

5
System.

6

7
     Dated:  May 26, 2022

8
                                 **POMERANTZ LLP**

9
                                 By: */s/ Joshua B. Silverman*
                                       Joshua B. Silverman

10

11
                                     *Lead Counsel*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28