**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

|  |  |
|---|---|
| KEVIN STUART, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>          v.<br><br>GINKGO BIOWORKS HOLDINGS, INC. F/K/A SOARING EAGLE ACQUISITION CORP., HARRY E. SLOAN, JASON KELLY, and MARK DMYTRUK,<br><br>                      Defendants. | Case No. 4:21-cv-08943-KAW<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing: November 17, 2022<br>Time: 1:30 p.m.<br>Court: Zoom Webinar<br>Judge: Hon. Kandis A. Westmore |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3)) ...................................... vii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ...................................................................................................................... 7

   I.   Applicable Standards Do Not Favor Dismissal .................................................... 7

   II.   The Complaint Adequately Pleads That Registration Statement Defendants Violated Section 11 of the Securities Act ........................................................................ 8

        a.   Plaintiff and Class Members Have Statutory Standing ........................................ 8

        b.   The Complaint Adequately Pleads Material Misrepresentations and Omissions in the Defective Proxy/Registration Statement .................................... 10

        c.   Section 11 Does Not Require Pleading Loss Causation ...................................... 18

   III.   The Complaint Adequately Pleads Secondary Liability Under Section 15 ...................... 18

   IV.   The Complaint Adequately Pleads Violation of Exchange Act Section 14(a) ................. 19

   V.   The Complaint Adequately Alleges Violation of Section 10(b) ...................................... 20

   VI.   The Complaint Adequately Alleges Secondary Liability Under Section 20(a) ................. 24

CONCLUSION ................................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings, Ltd.*,
    692 F.3d 34 (2d Cir. 2012)................................................................................23

*Avila v. L.A. Police Dep't*,
    758 F.3d 1096 (9th Cir. 2014) ...............................................................15, 16, 17

*Azar v. Blount Int'l, Inc.*,
    No. 3:16-cv-483-SI, 2017 WL 1055966 (D. Or. Mar. 20, 2017)........................19

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ..............................................................................10

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    No. 19-CV-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ....................17

*Brown v. Brewer*,
    No. CV 06–3731–GHK (SHx), 2010 WL 2472182 (C.D. Cal. June 17, 2010) .....................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ..............................................................................21

*Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,
    No. C 101094 SBA, 2010 WL 3790656 (N.D. Cal. Sep. 27, 2010) ........................7

*Desaigoudar v. Meyercord*,
    223 F.3d 1020 (9th Cir. 2000) ......................................................................12, 19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)............................................................................................20

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ........................................................10, 15, 18, 21

*Feyko v. Yuhe Int'l., Inc.*,
    No. 11-cv-5511-DDP(PJWx), 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ............15

*Flynn v. Sientra, Inc.*,
    No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016)...................1, 11, 12

*Gilligan v. Jamco Dev. Corp.*,
    108 F.3d 246 (9th Cir. 1997) ................................................................................7

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)........................................................................................1, 18

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ..........................................................................................1

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ...........................................................................................7

*In re BofI Holding Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................................22, 23

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................................12

*In re CV Sciences, Inc.*,
  No. 2:18-cv-01602-JAD-BNW, 2019 WL 6718086 (D. Nev. Dec. 10, 2019) .......................23

*In re Gilead Sci. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .......................................................................................7, 8

*In re Intrexon Corp. Sec. Litig.*,
  No. 16-cv-02398-RS, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) .....................................15

*In re Leapfrog Enter. Sec. Litig.*,
  237 F. Supp. 3d 943 (N.D. Cal. 2017) ........................................................................19, 20

*In re McKesson HBOC, Inc. Secs. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................................19

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ......................................................................................22, 23

*In re Plantronics, Inc. Sec. Litig.*,
  No. 19-CV-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ....................10, 13, 18

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .......................................................................................13

*In re QuantumScape Sec. Class Action Litig.*,
  No. 3:21-CV-00058-WHO, 2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ...........................23

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .........................................................................................12

*In re Shoretel Inc.*,
  No. C 08-00271 CRB, 2009 WL 2588881 (N.D. Cal. Aug. 18, 2009) ................................18

*In re Splunk Inc. Sec. Litig.*,
  No. 20-CV-08600-JST, 2022 WL 2525735 (N.D. Cal. Mar. 21, 2022) ..........................10, 13

*In re Surebeam Corp. Sec. Litig.*,
  No. 03 CV 1721JM(POR), 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) .........................10, 13

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ......................................................................18

*Johnson v. Knapp*,
    No. CV 02-9262-DSF(PJWx), 2009 WL 764521 (C.D. Cal. Mar. 16, 2009) .........................21

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..............................................................13, 21

*Lucero v. Ettare*,
    No. 15-CV-02654-KAW, 2016 WL 3924189 (N.D. Cal. July 21, 2016)...................15, 16, 17

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012)............................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .....................................................................................7

*Mendoza v. HF Foods Grp. Inc.*,
    No. 220CV02929ODWJPRX, 2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) .......................15

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ......................................................................13

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ............................................................23

*Neborsky v. Valley Forge Composite Techs., Inc.*,
    No. 13-CV-2307-MMA BGS, 2014 WL 3767011 (S.D. Cal. July 29, 2014) ...................13

*Osher v. JNI Corp.*,
    183 Fed. Appx. 604 (9th Cir. 2006)...............................................................24

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)...........................................................................11

*Pardi v. Tricida, Inc.*,
    No. 21-CV-00076-HSG, 2022 WL 3018144 (N.D. Cal. July 29, 2022) ........................14

*Pirani v. Slack Techs., Inc.*,
    13 F.4th 940 (9th Cir. 2021) ..............................................................9, 10, 14

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ..........................................................14

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ......................................................................17

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ......................................................................21

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .......................................................................................11, 12

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ........................................................................................14, 21

*SEC v. Hartcourt Cos.*,
    No. CV 03-3698 LGB(PLAx), 2003 U.S. Dist. LEXIS 27135 (C.D. Cal. Dec. 18,
    2003) .........................................................................................................................................12

*Strasburger v. Blackburne & Sons Realty Capital Corp.*,
    No. CV 20-00220-CJC(JCx), 2020 WL 6128069 (C.D. Cal. Apr. 22, 2020) ..........................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)...............................................................................................................21

*Vess v. Ciba-Ceigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................................................12, 19

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ..............................................................................................23

**Rules**

Fed. R. Civ. P. 8...............................................................................................................1, 11, 12

Fed. R. Civ. P. 9(b) ......................................................................................................11, 12, 19, 20

Fed. R. Civ. P. 12(b)(6).........................................................................................................7, 8

Fed. R. Civ. P. 15 .................................................................................................................24

**Statutes and Regulations**

17 CFR § 240.14a-9 ...............................................................................................................19

17 C.F.R. §229.303(b)(1)........................................................................................................14

Section 11 of the Securities Act of 1933 .............................................................................. *passim*

Section 14(a) of the Securities Exchange Act of 1934 ................................................... vii, 19, 20

Section 10(b) of the Securities Exchange Act of 1934 ......................................................... *passim*

Private Securities Litigation Reform Act.....................................................................20, 21, 24

**Other References**

Scorpion Capital LLC, About.
    https://scorpioncapital.com/about .......................................................................22, 23

Soaring Eagle Acquisition Corp. (2021) Form S-4/A.
    https://www.sec.gov/Archives/edgar/data/1830214/000119312521235409/d17700
    7ds4a.htm ............................................................................................................9

Synlogic (2021) Form 10-K.
    https://www.sec.gov/ix?doc=/Archives/edgar/data/1527599/00015645902101525
    6/sybx-10k_20201231.htm .................................................................................14

1

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

2

(1) Whether the Complaint alleges statutory standing under Section 11 of the Securities Act of

3

1933 ("Securities Act");

4

(2) Whether the Complaint alleges one or more actionable misrepresentations or omissions in

5

a registration statement in violation of Section 11 of the Securities Act;

6

(3) Whether the Securities Act imposes a burden on a plaintiff to allege loss causation at the

7

pleading stage, or reserves negative causation as an affirmative defense to be proved by

8

defendants;

9

(4) Whether the Complaint alleges control person liability under Section 15 of the Securities

10

Act;

11

(5) Whether the Complaint alleges one or more actionable misrepresentations or omissions in

12

a proxy violating Section 14(a) of the Securities Exchange Act ("Exchange Act");

13

(6) Whether the Complaint alleges loss causation under Section 14(a) of the Exchange Act;

14

(7) Whether the Complaint alleges violations of Section 10(b) of the Exchange Act;

15

(8) Whether the Complaint alleges control person liability under Section 20(a) of the Exchange

16

Act;

17

(9) Whether, if Defendants' motion to dismiss is granted in whole or in part, Plaintiff should

18

be granted leave to amend.

19

20

21

22

23

24

25

26

27

28

1    Plaintiff Sharon Bernstein ("Plaintiff") hereby opposes Defendants'[1] motion to dismiss (ECF

2    No. 61) as follows:

3                                      **INTRODUCTION**

4    Although Ginkgo's path to the public markets was complex, the Complaint is straightforward

5    and well-pled.  As it alleges, Defendants (other than Wagner, who is only a Defendant for ancillary

6    Section 10(b) claims) used a Defective Proxy/Registration Statement containing several material

7    inaccuracies and omissions to: (1) register all public Ginkgo shares to effect the initial public offering

8    of Ginkgo; (2) solicit shareholder approval for the "de-SPAC" merger that Ginkgo used to go public;

9    and (3) dissuade shareholders in the prior SPAC entity, Soaring Eagle Acquisition Corp., from

10   exercising their right to redeem shares for $10.  ¶¶1, 11-12, 47-48.

11   The Complaint's primary claim is brought under Section 11 of the Securities Act of 1933,

12   which "impos[es] a stringent standard of liability on the parties who play a direct role in a registered

13   offering" and "places a relatively minimal burden on a plaintiff." *Hildes v. Arthur Andersen LLP*, 734

14   F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82

15   (1983)).  Scienter, reliance and loss causation need not be shown, and even falsity need only be alleged

16   under the "short and plain statement" standard of Rule 8(a).  *See Herman & Maclean*, 459 U.S. at 382;

17   *Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *17 (C.D. Cal. June 9, 2016).

18   As long as "a plaintiff purchased a security issued pursuant to a registration statement, he need only

19   show a material misstatement or omission to establish his *prima facie* case." *Id.*

20   The Complaint easily meets this standard.  It identifies several material misstatements and

21   omissions in the Defective Proxy/Registration Statement.  *See* Section II.b, *infra*.  Unable to show

22   any infirmity in the misrepresentations and omissions alleged, Defendants manufacture a false

23   controversy about statutory standing.  Defendants speculate that some shares might be traceable to an

---

[1] Defendants are Ginkgo Bioworks Holdings, Inc. ("Ginkgo" or the "Company"), Harry E. Sloan, Eli Baker, Scott M. Delman, Joshua Kazam, Isaac Lee, Timothy Leiweke, Dennis A. Miller, Laurence E. Paul, Jason Kelly, Reshma Shetty, Arie Belldegrun, Marijn Dekkers, Christian Henry, Reshma Kewalramani, Shyam Sankar, and Anna Marie Wagner.  "Registration Statement Defendants" refers to all Defendants other than Wagner.  All references to "¶ " or "¶¶" are to the numbered paragraphs of the Second Amended Complaint ("Complaint"), ECF No. 58.  All references to "DM" are to the numbered pages of Defendants' memorandum, ECF No. 61.

earlier IPO of the SPAC sponsor, rather than the Defective Proxy/Registration Statement.  DM 21-22.  But every single share offered in the earlier IPO was expressly re-registered by the Defective Proxy/ Registration Statement, and is unquestionably traceable.  *See* Section II.a, *infra*.

Defendants' loss causation arguments fare no better.  Loss causation is not an element under Section 11, but rather an affirmative defense for Defendants to establish at the merits stage.  For the Complaint's Section 14 claim, loss causation is easily satisfied by allegations that the inaccuracies in the Defective Proxy/Registration Statement robbed investors of the opportunity to make informed decisions on whether to redeem shares for $10 (more than $7 higher than Ginkgo's current trading price) and whether to vote to approve the merger.  ¶¶82-83.  And, the discrete Section 10(b) claim alleges a decline upon the corrective event alleged with respect to that claim.  ¶111.

Finally, scienter is not an element at all for the Complaint's Section 11 and Section 14 claims.  For the ancillary claims pled in the alternative under Section 10(b), the Complaint allegations satisfy the applicable pleading requirements.

Because Defendants have failed to identify any pleading deficiency, their motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Defendant Ginkgo Bioworks Holdings, Inc. ("Ginkgo or the "Company") is a synthetic biology company that primarily provides commodity engineering of the *Pichia pastoris* yeast strain, the same service provided by a myriad of other companies.  ¶2.  Ginkgo's business consists of two main parts called "Foundry" and "Codebase." The Foundry is a yeast strain engineering lab with which Ginkgo provides R&D services to other companies.  ¶3.  The Codebase is a repository of the strains it has produced and the data it has retained about those strains.  ¶3.

Soaring Eagle Acquisition Corp. ("SRNG") was a special purpose acquisition company ("SPAC") formed as a corporation in the Cayman Islands in 2020 for the purpose of merging with, and bringing public, a business to be identified by its managers.  From its earliest SEC filings, SRNG described itself as a "blank check company."  ¶36.  On May 11, 2021, Soaring Eagle announced that it had entered into a merger agreement with Ginkgo, to effect the initial public offering of Ginkgo.  ¶42.  SRNG shares were listed and publicly traded on the NASDAQ.  ¶18.

All public Ginkgo shares *including those to be received by conversion of shares in the SPAC sponsor, Soaring Eagle,* were registered with the SEC as a Securities Act offering on Form S-4. The final full amended signed Form S-4/A filed on August 4, 2021, the body of which was incorporated into the prospectus filed on Form 424(b)(3) on August 13, 2021, together with information filed under Form 425 as a supplement to that registration statement pursuant to Rule 425 promulgated under the Securities Act, comprises the "Defective Proxy/Registration Statement." ¶4. The Defective Proxy/ Registration Statement instructed investors not to conduct their own due diligence, stating: "*You should rely only on the information contained or incorporated by reference into this proxy statement/prospectus*. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this proxy statement/prospectus." ¶48. (emphasis added).

The Defective Proxy/Registration Statement claimed that the SRNG Board conducted extensive due diligence of Ginkgo before agreeing to take it public via the merger, including research into the synthetic biology industry, extensive meetings with Ginkgo's management team, interviewing Ginkgo's customers, engaging independent consultants to review the underlying science and technology employed by Ginkgo, reviewing Ginkgo's material business contracts as well as patents and trademarks, and conducting financial and accounting due diligence. ¶44. The Defective Proxy/ Registration Statement claimed that the fair value of Ginkgo was a whopping $15 billion. ¶45.

In the Defective Proxy/Registration Statement, the Company made over a dozen false and misleading statements regarding its operations, including: (a) inaccurately describing circular related party deals that manipulated reported revenue and deferred revenue; (b) inaccurately describing the value of services it performed under the related party deals; (c) misrepresenting certain related parties as independent; and (d) overstating the amount of non-party related revenue Ginkgo generated. ¶¶9, 49-81.

The merger was contingent upon approval by SRNG shareholders, and having closing cash of at least $1.25 billion. ¶43. If those conditions were met, shareholders had the right to either convert SRNG shares to Ginkgo shares post-closing, or to redeem shares at $10/share. ¶43. The right to redeem applied to all shareholders, whether or not they voted to approve the merger. ¶43.

The Defective Proxy/Registration Statement stated that Ginkgo operated "in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services." ¶¶5, 49.  It did not.  Unlike cloud computing and CRO companies that obtain customers through competition and bill as services are rendered, Ginkgo and/or Ginkgo's three largest outside investors (Viking Global, Cascade, and General Atlantic) provided the overwhelming majority of funds that were recirculated by related party companies back to Ginkgo in the form of "revenue," often prepaid.  ¶5.

Regarding Foundry revenue, the Defective Proxy/Registration Statement stated Ginkgo received "upfront payments to cover R&D costs for customer programs" and that the Foundry division provided a "[h]ighly predictable revenue stream independent of program success," and doubled down that this revenue "provides a strong foundation of predictable revenue." ¶¶54, 56. The Defective Proxy/Registration Statement also claimed that "transparency" was "essential" to Ginkgo.  ¶63. It stated that its platform ventures allowed partnerships between Ginkgo and "leading multinationals." ¶51.  In fact, of Ginkgo's main platform ventures – Allonnia, Kalo Ingredients, Motif Foodworks and Joyn Bio – only one (Joyn Bio) was with a leading multinational, and the revenue was highly unpredictable.  ¶¶51, 86.

On a conference call announcing the SPAC merger, Defendant Kelly claimed that the work that Ginkgo did for Motif FoodWorks was similar to the plant-based food breakthroughs already achieved by Impossible Foods:  "[Motif] want[s] to pursue a whole range of different animal proteins that otherwise wouldn't be available in plants and then make those available to food developers so that we can have more Impossible Burgers. So they came to us with that spec. 'Get me a yeast that produces these animal proteins.'"  ¶¶70-71.  At a conference held by UBS, Defendant Wagner further touted Ginkgo as a "great host" for producing "proteins on behalf of Motif." ¶72.  Both of these statements were expressly incorporated into the Defective Proxy/Registration Statement via filings with the SEC on Form 425.  ¶¶70, 72.

The Defective Proxy/Registration Statement touted Motif FoodWorks as a top-two customer, stating that it represented more than 10% of Ginkgo's total revenue, but inaccurately minimized the interdependence by claiming that Ginkgo did not control the decisions of Motif.  ¶¶52-53.  Motif

FoodWorks operated out of Ginkgo's Boston headquarters, listed Defendant Shetty as its corporate agent, and listed Defendant Kelly and Ginkgo officer Jason Kakoyiannis as its directors.  ¶7.  Ginkgo investors led a $90 million preferred stock investment in Motif FoodWorks, and Motif FoodWorks provided Ginkgo common stock at a claimed value of $65.1 million as a prepayment for R&D services and licensing *from Ginkgo*.  Ginkgo recognized $20.8 million of revenue from Motif FoodWorks under this arrangement in 2020 and $19.0 million in 2019.  ¶7.  The Defective Proxy/Registration Statement touted that Motif FoodWorks "leverage[d] our Codebase and Foundry" to engineer "top performing proteins," but omitted that Motif's breakthrough actually came from stealing the patented invention owned by Impossible Foods.  ¶¶52-53, 105.  The Defective Proxy/Registration Statement also failed to disclose that Motif's CEO had raised concerns to Defendants Kelly and Ginkgo about "the unpredictable way" that Ginkgo was invoicing foundry credits.  ¶86.

The Defective Proxy/Registration Statement also stated that Ginkgo entered an agreement to provide R&D services for Allonnia "in return for ***cash consideration*** on a cost-plus fixed margin basis," and claimed revenue from Allonnia of $4.96 million in 2021 and almost $2.3 million in the first quarter of 2021 alone – a $9 million annual run rate.  ¶61.  It did not disclose that these funds were grossly out of line with the few employees and limited operations that Allonnia had, and were not actual revenues from needed services purchased competitively but rather recirculated funds that were provided to Allonnia by Ginkgo's own investors to then provide to Ginkgo.  ¶7.  Nor did the Defective Proxy/Registration Statement accurately disclose the relationship between Ginkgo and Allonnia.  It stated that Ginkgo "is not the primary beneficiary of Allonnia as it does not control the decisions that most significantly impact Allonnia's economic performance," including "development activities."  ¶61.  In fact, according to Allonnia's filings with the Massachusetts Secretary of State Corporations Division, Allonnia's principal office was in Ginkgo's corporate headquarters, and Allonnia was managed by Defendant Kelly and Ginkgo's Head of Ventures, Jason Kakoyiannis, among others, for the benefit of Ginkgo.  ¶97.

Kalo was described in the Defective Proxy/Registration Statement as a "vendor-customer" that had paid for $11.9 million in deferred revenue balance with Ginkgo by March 31, 2021, despite the fact that it had been formed only sixteen days earlier on March 15, 2021.  ¶¶7, 64.  It did not disclose

that Kalo had almost no employees at that time, making it virtually impossible that such prepayments represented payments for actual needed services.  ¶¶7, 64. Also not disclosed in Ginkgo's filings, but as Kalo admitted to Massachusetts regulators, Kalo operated out of Ginkgo's headquarter office building and had three Ginkgo executives, including Defendant Kelly, as its managers.  ¶¶95-96.

The Defective Proxy/Registration Statement also misreported the business relationship between Ginkgo and Synlogic.  While it disclosed the accounting treatment of 2019 transactions between Ginkgo and Synlogic, it did not disclose that the purpose of those transactions was to recycle back to Ginkgo $30 million of Ginkgo's own funds, which were provided by Ginkgo to Synlogic via purchasing Synlogic's securities at a price that exceeded fair value by $30 million.  ¶6.  Nor did the Defective Proxy/Registration Statement accurately describe Ginkgo's then-current deferred revenue liability to Synlogic, claiming it was only $72,000.  ¶58.  In fact, Ginkgo owed Synlogic nearly $14 million in prepaid R&D services.  ¶¶58-60.  And, the Defective Proxy/Registration Statement claimed that only $90,000 of revenue from Synlogic between 2019 and 2020 was related party revenue, in stark contrast to Synlogic's indication that it actually expended $16.4 million in prepaid services with Ginkgo in 2019 and 2020, all of which were pursuant to related party transactions.  ¶60.  Synlogic CEO Aoife Brennan later described Ginkgo's accounting of the services it billed to Synlogic as "loosey-goosey."  ¶86.

Having received inaccurate and misleading disclosures in the Defective Proxy/Registration Statement, as well as the instruction not to rely on any other source for information, on September 14, 2021: (1) SRNG investors overwhelmingly approved the merger with Ginkgo, effecting the initial public offering of Ginkgo shares; and (2) the majority of SRNG investors opted to receive Ginkgo shares rather than redeem for $10/share, allowing Ginkgo to satisfy the cash contingency.  ¶12. On September 17, 2021, Ginkgo shares went public on the New York Stock Exchange ("NYSE"), trading under the ticker "DNA."  ¶18.

On October 6, 2021, after the shareholder vote and after Ginkgo's IPO via reverse merger with Soaring Eagle, market researcher Scorpion Capital released a 175-page report ("Scorpion Report") describing Ginkgo as a "shell game" whose revenue is highly dependent on related party transactions. ¶87.  On that same day, Citron Research also came out with an article corroborating the factual findings

in the Scorpion Report.  ¶87.  The Scorpion Report's allegations were also consistent with an article in the *MIT Technology Review*, which cited a source stating Ginkgo was acting as "an arm of [its principal investor] Viking," and that its "true business could be described as financial engineering, not genetic engineering."  ¶85.

The Scorpion Report was based on twenty-one interviews "encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related party 'customers.'"  ¶88.  The Scorpion Report explained how nearly all Ginkgo revenue was actually derived from related parties, many of which were largely illusory entities with little or no operations.  ¶90.  It analyzed the prepayments made by related parties, compiling evidence indicating that they were not "legitimate vendor-customer transactions[s]."  ¶92.  The Scorpion Report further revealed that the primary customers of Ginkgo, such as Allonnia, Kalo, Joyn Bio, and Motif all operated out of Ginkgo's Boston headquarters, that many listed Ginkgo's phone number as their own, and that Ginkgo used intertwined employees, managers and directors to control these "customers." ¶¶94-100.

## ARGUMENT

### I.       Applicable Standards Do Not Favor Dismissal

As the United States Supreme Court instructs, securities fraud plaintiffs "need only allege enough facts to state a claim for relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).  On a Rule 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017) (citation omitted).  "[T]he purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to decide its merits." *Craig Frazier Design, Inc. v. Zimmerman Agency LLC*, No. C 101094 SBA, 2010 WL 3790656, at *6 (N.D. Cal. Sep. 27, 2010) (citation omitted). "The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted." *Strasburger v. Blackburne & Sons Realty Capital Corp.*, No. CV 20-00220-CJC(JCx), 2020 WL 6128069, at *2 (C.D. Cal. Apr. 22, 2020) (citing *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997)); *see also In re Gilead Sci. Sec. Litig.*,

536 F.3d 1049, 1057 (9th Cir. 2008) (a district court construing a Rule 12(b)(6) motion "is not sitting as a trier of fact").  Rather, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of proceedings."  *Gilead*, 536 F.3d at 1057.

## II.     The Complaint Adequately Pleads That Registration Statement Defendants Violated Section 11 of the Securities Act

### a.   Plaintiff and Class Members Have Statutory Standing

The Complaint alleges that the Section 11 claim is brought "on behalf of Plaintiff and all members of the Class who purchased or otherwise acquired Ginkgo securities pursuant or traceable to the Defective Proxy/Registration Statement."  ¶124; *see also* ¶17 (alleging that Plaintiff purchased shares as detailed in her previously-filed Certification, ECF No. 11-3, which shows that she purchased 5,000 shares on September 17, 2021, just *after* Ginkgo went public pursuant to the Defective Proxy/ Registration Statement).  Defendants incorrectly question traceability, speculating that Ginkgo public shares "could have come" either from the Defective Proxy/Registration Statement or "could instead have come from the pool of shares issued pursuant to the December 23, 2020" registration statement for Soaring Eagle.  DM 22 (internal quotation marks omitted).  For this reason, Defendants claim that additional facts should have been alleged "foreclosing that alternate explanation."  *Id.*  Defendants are wrong for three reasons.

*First,* Ginkgo's own SEC filings conclusively show that Defendants' assumption is factually wrong.  As the Defective Proxy/Registration Statement indicates, all 172,500,000 Soaring Eagle shares that were originally registered by the December 2020 registration statement (ECF No. 61-9) were in fact ***re-registered*** by the Defective Proxy/ Registration Statement:

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Class A common stock, par value $0.0001 per share(2)(3) | 172,500,000 | $9.90(4) | $1,707,750,000(4) | $186,316(5) |
| Redeemable warrants(2)(6) | 34,500,000 | $1.88(7) | $64,860,000(7) | $7,076(5) |
| Class A common stock, par value $0.0001 per share(2)(8) | 43,125,000 | $9.90(4) | $426,937,500(9) | $46,579(5) |
| Class A common stock, par value | 1,059,540,417 | $9.90(4) | $10,489,450,128(11) | $1,144,399(5) |

| | | | | |
|---|---|---|---|---|
| $0.0001 per share(2)(10) | | | | |
| Class B common stock, par value $0.0001 per share(2)(12) | 620,154,976 | $9.90(4) | $6,139,534,262(13) | $669,823(5) |
| Total | | | $18,828,531,891 | $2,054,193(14) |

(1)  Prior to the consummation of the business combination described in the proxy statement/prospectus forming part of this registration statement (the "proxy statement/prospectus"), Soaring Eagle Acquisition Corp., a Cayman Islands exempted company limited by shares ("SRNG"), intends to effect a deregistration under the Cayman Islands Companies Act (As Revised) and a domestication under Section 388 of the Delaware General Corporation Law, pursuant to which SRNG's jurisdiction of incorporation will be changed from the Cayman Islands to the State of Delaware (the "Domestication"). As used herein, "New SRNG" refers to SRNG after the Domestication. All securities being registered will be issued by New SRNG, the continuing entity following the Domestication, or New Ginkgo, the continuing entity following the business combination described in this proxy statement/prospectus, which will thereafter be renamed "Ginkgo Bioworks Holdings, Inc.", as further described in the proxy statement/prospectus. As used herein, "New Ginkgo" refers to SRNG after the consummation of the business combination described in this proxy statement/prospectus.

(2)  Pursuant to Rule 416(a) of the Securities Act, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(3)  ==The number of shares of common stock of New SRNG being registered represents the number of Class A ordinary shares of SRNG ("SRNG Class A ordinary shares") that were registered pursuant to the Registration Statement on Form S-1 (333-251661) (the "IPO Registration Statement") and offered by SRNG in its initial public offering.== The SRNG public shares automatically will be converted by operation of law into shares of Class A common stock, par value $0.0001 per share, of New Ginkgo ("New SRNG Class A common stock" or "New Ginkgo Class A common stock") in the Domestication.

*See* Form S-4/A filed August 4, 2021, (highlighting added), available at https://www.sec.gov/ Archives/edgar/data/1830214/000119312521235409/d177007ds4a.htm.[2] Moreover, as Registration Statement Defendants admitted in footnote 1 to this chart, neither Ginkgo nor Ginkgo's predecessor "New SRNG" offered shares in the December 23, 2020 offering; those were offered by the original SRNG, an entity domiciled in the Cayman Islands ***that was deregistered*** prior to the merger. *Id.* SRNG shares traded only on the NASDAQ, whereas DNA shares trade on the NYSE.

      *Second*, as the Ninth Circuit recently clarified, shares are traceable to a registration statement for purposes of Section 11 if their trading was facilitated by the registration statement, whether the shares themselves were registered or unregistered. *Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 948 (9th Cir. 2021).  There, it held that "both the registered and unregistered Slack shares sold in the direct listing were sold 'upon a registration statement' because they could only be sold to the public at the time of the effectiveness of the statement" and therefore the "connection between the purchase of the

---

[2] The prospectus for which Defendants seek judicial notice (*see* ECF No. 61-2) is virtually identical to the Defective Proxy/Registration Statement, but because it is on a prospectus form rather than a registration statement form, it does not contain this information, which is presented as part of the calculation of the registration fee.

security and the registration statement is clear." *Id.*  Likewise, here, no shares of *Ginkgo* could be approved or publicly sold if the merger were not approved pursuant to the Defective Proxy/ Registration Statement, and every Ginkgo share is thus traceable to the Defective Proxy/Registration Statement.

*Third,* the Defective Proxy/Registration Statement explains that it registered more than the entire number of shares that Ginkgo said would be outstanding after the offering.  Compare the chart reproduced above (registration covered 1,895,320,393 shares and 34,500,000 warrants) with Q&A section of the Defective Proxy/Registration Statement ("[i]t is anticipated that, upon completion of the Business Combination, the ownership interests in New Ginkgo will be" 1,780,280,228 shares "Assuming No Redemptions" and 1,632,822,885 shares "Assuming Maximum Redemptions").  That more shares were registered than outstanding provides compelling evidence that *any* share purchased in the months following the merger was both traceable to <u>and</u> registered by the Defective Proxy/ Registration Statement.

### b.  The Complaint Adequately Pleads Material Misrepresentations and Omissions in the Defective Proxy/Registration Statement

Plaintiff's Complaint adequately alleges several material misrepresentations and omissions in the Defective Proxy/Registration Statement.  ¶¶9, 49-81.  A statement giving a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists" is misleading and actionable.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact," and "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds [could] not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995); *see also In re Plantronics, Inc. Sec. Litig.*, No. 19-CV-07481-JST, 2022 WL 3653333, at *15 (N.D. Cal. Aug. 17, 2022) ("adequacy of disclosure is normally a jury question") (quotation and citation omitted); *In re Splunk Inc. Sec. Litig.*, No. 20-CV-08600-JST, 2022 WL 2525735, at *12 (N.D. Cal. Mar. 21, 2022) (same); *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005) (same).  Here, it unquestionably belongs to the trier of fact.

1    The Complaint more than adequately identifies the misrepresentations and omissions in
2  question. For each, it specifies the particular statement alleged to be misleading; who made the
3  statement (the parties statutorily responsible for the content of the Defective Proxy/Registration
4  Statement pursuant to Section 11); where and when the statement was disseminated (mostly in the
5  final full Form S-4/A, but a few in external statements incorporated into the Defective Proxy/
6  Registration Statement via Form 425); and why Plaintiff contends it was false and/or misleading when
7  made.  ¶¶49-81.  Defendants' motion concedes as much, addressing the alleged misrepresentations
8  and omissions and thereby acknowledging that Defendants are well-informed about what Plaintiff
9  alleges to be false or misleading, by whom, when, where, and why.

10    These details exceed the applicable pleading standard.  Section 11 claims need only be alleged
11  under the "short and plain statement" standard of Rule 8.  *Sientra*, 2016 WL 3360676, at *17; *Panther*
12  *Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).  Defendants' attempt to
13  foist a higher pleading upon the Complaint's Section 11 claim lacks merit.  It does not "sound in
14  fraud," and its "language and structure" do not "allege[] a unified course of fraudulent conduct and
15  rel[y] entirely on that course of conduct as the basis of" the Section 11 claim.  *See Rubke v. Capitol*
16  *Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotations and alterations omitted).

17    Instead, the Section 11 claim here is expressly brought under a theory of strict liability as to
18  the Company (¶125) and negligence as to other Registration Statement Defendants, based on their
19  "fail[ure] to make a reasonable investigation" into the truth of the statements in the Defective Proxy/
20  Registration Statement and failing to "exercise reasonable care" to avoid misrepresentations.  ¶¶123,
21  126-27.  These allegations are not part of the fraud-based Section 10(b) claim, which is pled in the
22  alternative.  Nor does the Section 11 claim incorporate <u>any</u> allegations contained in the Section 10(b)
23  portion of the Complaint, which is structurally separated into a discrete section entitled "Additional
24  Facts Alleged Only With Respect To Counts IV and V," or otherwise accuse Defendants of intending
25  to mislead investors.  ¶¶106-11.

26    Moreover, while there is some overlap in Defendants between the negligence-based Section
27  11 claim and the fraud-based Section 10(b) claim, there is no identity.  Thirteen of the sixteen Section
28  11 Defendants (81.25%) are not even named in the Section 10(b) claim.  *Compare* Count I *with* Count

1   IV.  As other courts have found, it would "eviscerate §11" to give Rule 9(b) protection to defendants

2   against whom no fraud has been alleged.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d

3   1132, 1163 (C.D. Cal. 2008).  And, as to the small subset of Defendants named in the Section 10(b)

4   claim, the claim addresses several facts that are not part of the Section 11 claim.  ¶¶106-11.[3]  *See*

5   *Sientra,* 2016 WL 3360676, at *17 (Rule 8 applied where, as here, plaintiff only "levie[d] fraud

6   allegations against a select few defendants" based upon "specifie[d] unique, particularized facts as to

7   those defendants").

8          Thus, Rule 9(b) cannot properly be applied to the Complaint's Section 11 claim.  However,

9   even if it did apply, it is easily satisfied by the Complaint's detailed allegations.  Rule 9(b) does not

10  require pleading of evidence.  *SEC v. Hartcourt Cos.*, No. CV 03-3698 LGB(PLAx), 2003 U.S. Dist.

11  LEXIS 27135, at *17-18 (C.D. Cal. Dec. 18, 2003).  Instead, the rule is satisfied by pleading the "who,

12  what, when, where, and how" of alleged fraudulent activity. *Vess v. Ciba-Ceigy Corp. USA*, 317 F.3d

13  1097, 1106 (9th Cir. 2003).  The Complaint would easily meet this standard if it applied.

14          ***Misrepresentations and omissions about Foundry revenue:*** The Defective Proxy/

15  Registration Statement boasted that Ginkgo's Foundry revenue was a "[h]ighly predictable revenue

16  stream independent of program success," and "provides a strong foundation of predictable revenue."

17  ¶¶54, 56.  It claimed the Foundry operated "in much the same way that cloud computing companies

18  charge usage fees for utilization of computing capacity or contract research organizations (CROs)

19  charge for services."  ¶¶5, 49.  In reality, Ginkgo's Foundry operated nothing like a cloud computing

20  company or a CRO charging for services, and billed in a manner that was not "highly predictable" but,

21  according to its own customer, "loosey-goosey."  ¶86.  And, the revenue it received was not for

22  providing valued services to clients, but was instead round-tripped money that was actually provided

23  by Ginkgo's lead investors or Ginkgo itself, a business model the *MIT Technology Review* called

24

25  _____

26  [3] Neither of the "sounds in fraud" cases that Defendants cite support extending Rule 9(b) to the Section
    11 claim under these circumstances.  *Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000)
    involved common allegations lacking here asserting that the defendants' misrepresentations were
27  "knowing[ ] and intentional[ ]." *Id.* at 1023.  And, *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869,
    885–86 (9th Cir. 2012), unlike here, alleged the exact same conduct for all claims, and thus "rel[ies]
28  entirely" on a "unified course of fraudulent conduct."  *See Rubke*, 551 F.3d at 1161.

"financial engineering" not "genetic engineering."  ¶¶5, 49, 85.

It is well-settled that it is a material omission to fail to disclose the manner by which the company generates revenue, *see Neborsky v. Valley Forge Composite Techs., Inc.*, No. 13-CV-2307-MMA BGS, 2014 WL 3767011, at *6-7 (S.D. Cal. July 29, 2014), or to mischaracterize the strength of its customer base.  *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1144 (9th Cir. 2017).  Defendants cannot point to a single sentence in their Defective Proxy/Registration Statement accurately stating that Foundry revenues were less than highly predictable, let alone "loosey-goosey," or that revenue was round-tripped and reflected a circular re-investment rather than a fair market reflection of valued services provided at competitive rates to clients.  Even worse, the Defective Proxy/ Registration Statement instructed investors to ignore any outside source that might question its narrative.  ¶¶48, 84-86.

Nevertheless, Defendants claim that investors should have guessed the truth from other vague and limited statements made in the Defective Proxy/Registration Statement.  DM 8.  They are wrong, and none of the language to which they point accurately or fully disclosed the truth to investors.  Regardless,  "adequacy of disclosure is normally a jury issue."  *Plantronics*, 2022 WL 3653333, at *15; *Splunk*, 2022 WL 2525735, at *12; *Surebeam*, 2005 WL 5036360, at *13.  Moreover, the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *Miller v. Thane Int'l, Inc*., 519 F.3d 879, 886 (9th Cir. 2008).[4]

***Misrepresentations and omissions about Synlogic:***  The Complaint alleges that the Defective

---

[4] Defendants also argue that their statement about the foundry revenue's TAM should be assumed not misleading based on external evidence they cite from Wikipedia and a Corporate Finance Institute article.  DM at 10.  Neither was cited in the Complaint and even Defendants do not contend that either can be judicially noticed.  *See* ECF No. 62 (request for judicial notice not seeking notice of either piece of external evidence).  *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018).  Indeed, the Defective Proxy/Registration Statement specifically instructed investors "not to rely" on such information.  ¶48.  That Defendants employ external evidence to dispute well-pleaded Complaint allegations only confirms that the criticisms raised are factual disputes which must be resolved at summary judgment or trial.  *Plantronics*, 2022 WL 3653333.  And, Defendants' external evidence will be proved irrelevant because it refers only to industry TAM.  The statement alleged here said the "total addressable market for OUR foundry revenue" (not foundry revenue in the abstract) was $40 billion, a highly misleading statement given that Ginkgo operated in the subset of the market involving commodity yeast engineering, as did many other companies.  ¶¶2, 50, 84.

Proxy/Registration Statement failed to disclose $13.6 million in prepaid services that Ginkgo still owed to Synlogic, an established public company mentioned more than 100 times in the Defective Proxy/Registration Statement.  Instead, it misrepresented Ginkgo's obligation as being less than $80,000.  ¶¶58-60.  Full disclosure was required for two reasons.  First, "[o]nce defendants chose to tout" the Synlogic relationship in the Defective Proxy/Registration Statement, "they were bound to do so in a manner that wouldn't mislead investors," *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016), "including disclosing adverse information that cuts against the positive information." *Id.* at 707; *Pardi v. Tricida, Inc.*, No. 21-CV-00076-HSG, 2022 WL 3018144, at *4 (N.D. Cal. July 29, 2022).  Second, failure to disclose this multi-million dollar liability was a plain violation of Regulation S-K Item 303, which requires disclosure of "material cash requirements from known contractual and other obligations." 17 C.F.R. §229.303(b)(1).  "Allegations which state a claim under Item 303 also state a claim under Sections 11." *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 385 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021).

Again, Defendants blame investors for their own inaccurate disclosure, claiming that they should have surmised the truth from opaque disclosures in a few pages "describing [the] equity investment in Synlogic." DM 8.  But none of the referenced pages actually states that the obligation was $13.6 million, and Defendants do not show how the limited information it does disclose accurately conveys the extent of Ginkgo's obligation to Synlogic.  That truth was only revealed separately in an SEC filing ***by Synlogic***, in a document upon which the Defective Proxy/Registration Statement instructs investors not to rely.  ¶¶48, 58-60.  *Compare* Synlogic 10-K dated March 25, 2021 ("At December 31, 2020, the Company had remaining balances of $4.7 million and $8.9 million of current and non-current pre-paid research and development costs related to this transaction, respectively.").[5] Similarly, the Defective Proxy/Registration Statement omitted that the Synlogic relationship was a commercial failure, and that despite Ginkgo owing Synlogic $13.6 million of pre-paid R&D services, Synlogic had hired competitor Zymergen because the organisms Ginkgo had engineered were not

---

[5] Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1527599/000156459021015256/sybx-10k_20201231.htm

successful.  ¶¶59, 84.  Defendants do not challenge or even mention this omission in their motion, and

therefore have waived any argument that it is not adequately pled.  *See Avila v. L.A. Police Dep't*, 758

F.3d 1096, 1101 (9th Cir. 2014) ("Arguments not raised clearly and distinctly in the opening brief

are waived.") (internal quotation omitted); *Lucero v. Ettare*, No. 15-CV-02654-KAW, 2016 WL

3924189, at *4 n.4 (N.D. Cal. July 21, 2016) ("As Defendants have failed to address this issue in

their opening brief, they have waived it."); *see also Feyko v. Yuhe Int'l., Inc.,* No. 11-cv-5511-

DDP(PJWx), 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013) (a plaintiff "can survive a motion

to dismiss by alleging a single material misrepresentation.").

The Defective Proxy/Registration Statement also misleadingly described a $30 million "cash

… non-refundable prepayment for Foundry services" that it claimed ***Synlogic*** "provided," when in

fact Ginkgo itself provided the funds to be recycled to it in a circular transaction.  ¶58.  Defendants

claim that investors should have pieced this together from other opaque bits of information, but a

reasonable jury could find that its failure to accurately state the nature of the transaction was

misleading, and it remains an issue for the trier of fact.  *See, e.g., Fecht*, 70 F.3d at 1080-81.[6]

***Misrepresentations and omissions about Motif FoodWorks:***  With respect to Motif, a top-two

customer, the Defective Proxy/Registration Statement: (a) inaccurately denied control over Motif,

¶¶52-53, when in fact Ginkgo embedded an employee to oversee Motif's R&D whose role was to

funnel "R&D spend" back to Ginkgo, Motif operated out of Ginkgo's Boston headquarters, had

Defendant Shetty as its corporate agent and multiple Ginkgo executives as directors, and relied on

Ginkgo and Ginkgo's lead investors for funding, ¶¶7, 53; (b) inaccurately stated that Motif was able

to "leverage[e] our Codebase and Foundry" to engineer "top performing proteins," when Motif's

---

[6] Defendants' heavy reliance on *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, *1, *5 (N.D. Cal. Feb. 24, 2017) is misplaced.  That case does not excuse misleading disclosure of round-trip payments. To the contrary, *Intrexon* expressly stated that the complaint there – unlike here – ***did not allege*** "that Intrexon's collaboration agreements involved reciprocal contracts to exchange similar amounts of money or that the agreement lacked economic substance." 2017 WL 732952 at *5.  Plaintiff here alleges both a reciprocal contract to exchange similar amounts of money (*see, e.g.*, Synlogic) and agreements that lacked economic substance (*see, e.g.,* Allonnia, Kalo, etc.).  *Mendoza v. HF Foods Grp. Inc.,* No. 220CV02929ODWJPRX, 2021 WL 3772850, at *7 (C.D. Cal. Aug. 25, 2021) is likewise irrelevant.  The vague allegations there alleged no factual basis for asserting that the disclosures regarding related parties were false or misleadingly incomplete, the exact opposite of the detailed allegations here about the Defective Proxy/Registration Statement.

breakthrough actually came from stealing the patented invention owned by Impossible Foods, ¶¶53, 105; and (c) failed to disclose that Motif's CEO had raised concerns to Defendants Kelly and Ginkgo about "the unpredictable way" that Ginkgo was invoicing Foundry credits.  ¶86.  Each of these is well-pled, and Defendants point to no language in the Defective Proxy/Registration Statement that accurately disclosed the omitted information.

Unable to address the substance of the omissions, Defendants instead raise a straw argument about whether *Ginkgo* was named as a defendant in the Motif patent infringement lawsuit.  DM 13. That has nothing to do with the omission alleged, which contends that the failure to disclose the actual basis for Motif's breakthrough proteins – stealing a patented invention – rendered misleading language claiming that they were enabled by "leverage[ing] our Codebase and Foundry."  ¶¶53, 105.  Similarly, while Defendants claim that they disclosed the actual degree of business control Ginkgo exercised over Motif, *see* DM 11 (citing pp. 295-96 and F-45-46 of ECF No. 61-2), the pages they cite misleadingly ***deny*** control of Motif as a matter of accounting rules, and do not address the actual omissions alleged.  Neither the pages referenced nor Defendants' motion even mention specific facts alleged evidencing Ginkgo's operational control over Motif, including that Ginkgo was able to control Motif's R&D spending because it embedded its own employee as Motif's R&D director and that Motif primarily operated out of Ginkgo's own headquarters. *See* ¶53; *Avila*, 758 F.3d at 1101; *Lucero*, 2016 WL 3924189, at *4 n.4.

***Misrepresentations and omissions about Kalo Ingredients:***  Defendants' motion does not squarely address the Complaint allegations about Kalo, another "customer" highlighted in the Defective Proxy/Registration Statement.   The Complaint alleges a series of facts plausibly demonstrating both that Kalo was actually controlled by Ginkgo and that huge prepayments it made to Ginkgo did not represent actual business operations but were instead a mechanism to provide shadow funding to Ginkgo, including that: (a) Kalo itself claimed to have zero of its own employees; (b) Kalo told Massachusetts regulators it was managed by three Ginkgo employees (Defendant Kelly, Jason Kakoyiannis, and Jasmine Aganovic); (c) that Kalo operated out of Ginkgo's Boston headquarters and told Massachusetts regulators that its mailing address was "C/O Ginkgo Bioworks, Inc." at that office and (d) the date on which Ginkgo claimed that Kalo had accumulated an $11.9

1   million deferred revenue balance was only 16 days after the Kalo entity was formed, making it

2   virtually impossible that such prepayments represented payments for actual needed services.  ¶¶7, 64,

3   95-96.  None of these facts are even mentioned, let alone addressed, in Defendants' motion.  Therefore,

4   any challenge has been waived.  *Avila*, 758 F.3d at 1101; *Lucero*, 2016 WL 3924189, at *4 n.4.

5          ***Misrepresentations and omissions about Allonnia***:  As with Kalo, the Complaint alleges

6   specific facts showing that Ginkgo exercised operational control over Allonnia, contradicting the

7   denial of control in the Defective Proxy/Registration Statement.  ¶¶61-62, 97.  Among other things:

8   (a) Allonnia reported to Massachusetts regulators that both Defendant Kelly and Ginkgo executive

9   Jason Kakoyiannis were its "managers;" (b) Allonnia operated out of Ginkgo's Boston headquarters;

10  (c) that Allonnia indicated that its mail should be sent "c/o Ginkgo Bioworks;" and (c) the revenue

11  Ginkgo claimed from Allonnia (over $7.2 million) was grossly out of line with the scale of Allonnia,

12  which only had six employees, suggesting these were sham transactions.  *Id.*  None of these facts were

13  disclosed in the Defective Proxy/Registration Statement.  *Id.* Again, Defendants do not challenge or

14  even mention any of these specific factual allegations in their motion, and thus have waived any claim

15  they are deficient.  *Avila*, 758 F.3d at 1101; *Lucero*, 2016 WL 3924189, at *4 n.4.

16         ***Misrepresentations and omissions about other purported customers***:  As detailed in the

17  Complaint, the Defective Proxy/Registration Statement made misrepresentations and omissions about

18  Joyn Bio similar to those about Allonnia and Kalo.  ¶¶7, 51, 94, 99.  Defendants' motion does not

19  address the specific facts alleged.  About Cronos, it highlighted a license that Cronos itself said was

20  impaired.  ¶¶10, 65, 104.  Defendants incorrectly claim that they might have been blind to issues about

21  the license until Cronos issued a press release.  DM 12-13.  But, a license does not become impaired

22  because it is successful, and it is implausible to assume as a matter of law that Ginkgo – the party

23  responsible for providing the services under the license – would be unaware of problems.[7]  At best,

24

25  [7] *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 693-94 (9th Cir. 2011), cited by Defendants, does not
26  excuse their non-disclosure.  *BP* held that a statement about compliance was not actionable while a
    defendant was complying.  Here, the license was impaired at the exact same time Defendants made
27  the statements touting its productivity targets with Cronos.  *See Bos. Ret. Sys. v. Uber Techs., Inc.*, No.
    19-CV-06361-RS, 2020 WL 4569846, at *7-8 (N.D. Cal. Aug. 7, 2020) (ruling that optimistic
28  statements were actionable when defendants knew facts that undermined the statements yet still

Defendants raise a factual issue for the trier of fact.  *See, e.g., Fecht*, 70 F.3d at 1080-81; *Plantronics*, 2022 WL 3653333.

### c.  Section 11 Does Not Require Pleading Loss Causation

The Supreme Court and Ninth Circuit are both absolutely clear: loss causation is not an element under Section 11 and need not be alleged to establish a *prima facie* case.  *Herman & Maclean*, 459 U.S. at 382; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994).  Negative causation is an affirmative defense under Section 11 generally determined at "summary judgment or at trial."  *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1131 (S.D. Cal. 2012) (citation and quotation omitted).  "To conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies."  *Id.*

Only if a Section 11 claim **on its face** definitively limits the corrective dates in question, **and** defendants definitively prove that all drops on those dates "resulted from factors other than the [alleged] misstatement" can negative causation be considered on the pleadings.  *In re Shoretel Inc.*, No. C 08-00271 CRB, 2009 WL 2588881 at *13 (N.D. Cal. Aug. 18, 2009) (internal citations omitted). Neither prerequisite is present here.  Consistent with controlling authority, the Section 11 claim here does not limit how or when the information misstated and omitted in the Defective Proxy/Registration Statement was corrected.  For that matter, Defendants do not explain let alone definitively prove an alternate cause for why shares dropped from above $10 when offered to below $3 at the time the Section 11 claim was first filed, the statutory measure of damages.  Finally, even with respect to the one event Defendants do discuss, the Scorpion Report, Defendants do not dispute that prices dropped upon dissemination (notwithstanding a short rebound that quickly eroded into further losses) or that the Scorpion Report was closely related to the matters Plaintiff alleges were misrepresented or omitted.

### III.   The Complaint Adequately Pleads Secondary Liability Under Section 15

Count II of the Complaint also adequately pleads secondary liability for certain primary

---

allowed the statements to be made).

Section 11 violations pursuant to Section 15 of the Securities Act.  Defendants challenge this claim only as to the sufficiency of the underlying primary violation.  *See* DM 24.  Because the primary violation is adequately alleged, *see* Sections II(a) to (c), *supra*, this challenge must fail.

## IV.   The Complaint Adequately Pleads Violation of Exchange Act Section 14(a)

In addition to serving as a registration statement, the Defective Proxy/Registration Statement also served as a proxy to: (1) solicit shareholder vote to approve the merger; and (2) solicit shareholder action on whether to redeem SRNG shares.  ¶¶1, 11-12, 47-48.  Because it contained material misrepresentations and omissions as discussed in Section II(b), it violated Section 14(a) and Rule 14a-9, which "'disallow the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading.'"  *Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 WL 1055966, at *4 (D. Or. Mar. 20, 2017) (quoting *Desaigoudar*,  223 F.3d at 1022).

Although the Count does not sound in fraud, the Court need not reach whether Rule 9(b) applies to Count III.  Plaintiff agrees that Section 14(a) claims must be pled with particularity under the Private Securities Litigation Reform Act, "a similar requirement" to Rule 9(b).  *In re Leapfrog Enter. Sec. Litig.*, 237 F. Supp. 3d 943, 950 (N.D. Cal. 2017).  The Complaint satisfies that requirement, identifying the Defective Proxy/Registration Statement containing the misleading proxy solicitation, identifying when and how that document was disseminated, who prepared and reviewed the document, which particular statements Plaintiff contends were misleading, and why each was misleading when made.  *See* Section II(b), *supra*; *see also* ¶¶49-81.  If Rule 9(b) applied, such details would also satisfy that rule.  *Vess*, 317 F.3d at 1106.

Claims under Rule 14(a) require only allegations of negligence, not scienter.  *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).  The Complaint here alleges that each Individual Defendant named in Count III was a director who was personally involved in the review of the Defective Proxy/Registration Statement, but did not exercise due care.  ¶138.  A "director may be found negligent under Section 14(a) for a failure to notice material omissions upon reading a proxy statement."  *Brown v. Brewer*, No. CV 06–3731–GHK (SHx), 2010 WL 2472182, at *24-25 (C.D. Cal. June 17, 2010).

1    The Complaint likewise alleges loss causation.  It contends that the Defective Proxy/

2    Registration Statement was the central document used to solicit votes to approve the merger, and to

3    solicit each shareholder's decision to redeem or hold shares.  ¶¶1, 47-48, 136-141.  It also alleges why

4    shareholders suffered economic loss as a result of the failure to provide an accurate and not misleading

5    proxy.  Because the Defective Proxy/Registration Statement was used to solicit merger approval,

6    shareholders were put in a worse economic position than if the merger was denied, because SRNG

7    shareholders received "inadequate consideration," ¶139, and less value than if the merger were

8    rejected and the trust fund returned to shareholders, ¶38, yielding approximately $10/share.  Likewise,

9    the misrepresentations in the Defective Proxy/Registration Statement deprived shareholders of the

10   opportunity to fairly evaluate whether to redeem shares for $10.  ¶¶1, 11-12, 47-48, 82-83.  Defendants

11   do not dispute that either return of the trust fund or redemption would yield more than twice the current

12   share price.

13   **V.      The Complaint Adequately Alleges Violation of Section 10(b)**

14       The Complaint also alleges in the alternative that a subset of Defendants – Ginkgo, Sloan,

15   Kelly and Wagner – violated Exchange Act Section 10(b) by making misrepresentations to investors

16   that were at least reckless.  This claim relies on numerous discrete facts, structurally separated into

17   their own section of the Complaint, that are not alleged with respect to the Securities Act and Section

18   14(a) claims.  *See* ¶¶106-11.  Section 10(b) claims must allege: "(1) a material misrepresentation or

19   omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission

20   and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5)

21   economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804,

22   809-10 (2011) (citations omitted).  Here, Defendants challenge only the pleading of material

23   misrepresentations or omissions, scienter, and loss causation.  Each is adequately pled.

24       For each statement or omission, the Complaint alleges who made it, when, where and how it

25   was disseminated to investors, and why Plaintiff contends it was false and/or misleading when made.

26   ¶¶49-81.  Such details satisfy the particularity requirements of the PSLRA, and would also satisfy

27   Rule 9(b) if it applied.  *Leapfrog*, 237 F. Supp. 3d at 950.  While Defendants claim that some

28   statements might be technically true, Section 10(b) does not protect half-truths: "Even if a statement

is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09. Once officers or directors of a publicly traded company choose to "tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including by disclosing adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 706.[8]  Instead, Defendants show only that they have their own reading of the statements to present at trial.  That is of no moment here, where the Court "ignores Defendants' version of the facts and relies, instead, on Plaintiff's version contained in the Complaint and any inferences that can be drawn from it." *Johnson v. Knapp*, No. CV 02-9262-DSF(PJWx), 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009); *see also Fecht*, 70 F.3d at 1080-81 ("materiality" and "adequacy of disclosure" are generally jury questions).

The alternative allegations that the Complaint structurally separates and pleads only with respect to Section 10(b) also support a strong inference of scienter.  Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705.  A "strong inference" "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324–326 (2007). The test is simply an inquiry into "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," and is satisfied so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 322-324 (emphasis in original).  The Complaint readily satisfies this standard.

Here, Section 10(b) allegations support a finding that the misrepresented material was known to Ginkgo and its senior executives.  As the Ninth Circuit has explained, where defendants make misleadingly incomplete or false misstatements about matters about which they claim knowledge, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), *overruled on other grounds*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*. 856 F.3d 605 (9th Cir. 2017).  For example, according to Confidential Witness 1

---

[8] Notably, Defendants do not dispute the Complaint allegations that these statements are wholly outside the PSLRA's safe harbor.  ¶¶112-13.  At any rate, it categorically cannot apply for the reasons alleged in the Complaint, and because the statements in question are not forward-looking.

("CW1"), then a Commercial Coordinator at Ginkgo, senior management discussed revenue, credits, and the trajectory of funds at meetings that CW1 attended.  ¶107.  CW1 also reported that multi-million-dollar equipment would routinely go unused at the Ginkgo Foundry.  ¶107.  In CW1's view, Ginkgo engaged in these related party transactions to create the sense that Ginkgo could do the work so that other companies would want to work with Ginkgo.  ¶107.  According to CW2, a Senior Test Engineer, failure of several projects had already been reported internally on interim reports, but Ginkgo continued working on the projects despite documented failure.  ¶108.  CW2 raised these concerns to senior management at weekly technical meetings where these interim reports were discussed, as well as at town hall meetings.  ¶108.

Finally, the Section 10(b) claim alleges loss causation, by demonstrating that Ginkgo share prices *fell 12%* upon the partial disclosure asserted in the Scorpion Report, as separately corroborated by another analyst, Citron Research.  *See* ¶111 ("On October 6, 2021, as a direct result of the disclosures made in the Scorpion Report, Ginkgo's shares fell $1.39 per share, or approximately 12%, to close at $10.59 per share on heavy volume, damaging investors."); *see also* ¶87 (Citron Research corroborated).  Unable to refute this damning fact, Defendants present a chart that manipulates it away.  *See* DM 20.  Defendants' chart, purports to show that prices moved up after the Oct. 6, 2021 issuance of the Scorpion Report.  *See id.*  But, as Defendants' own exhibit (ECF No. 61-7) concedes, the stock price actually declined 12% that day after the Scorpion Report was released, just as the Complaint alleges.  Defendants have not shown, and at trial will not be able to show, that the decline came from any factor other than the Scorpion Report's disclosure of previously misrepresented information.

The Scorpion Report must be credited under Ninth Circuit standards.  While Defendants cite *BofI Holdings* and *Nektar Therapeutics* for the proposition that short seller reports can be disregarded, neither states such a categorical proposition.  *See In re BofI Holding Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022).  Instead, even an anonymous short-seller (unlike here)[9] must be credited where it plausibly "provide[s] new information

_____

[9] Defendants' characterization of Scorpion as anonymous raises another unfounded factual dispute that will be disproved upon cross-examination.  Even a cursory examination of Scorpion's website reveals that it is the work of Kir Kahlon, a highly-experienced professional investor with decades of

to the market," either by identifying information not previously released or by assessing "extensive and tedious research involving the analysis of far-flung bits and pieces of data." *Nektar Therapeutics*, 34 F.4th at 839 (quoting *BofI Holding*).  The Scorpion Report does both.  It provides previously-unknown information, including admissions from "21 research interviews, encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related-party 'customers.'"  ¶88 (quoting Scorpion Report).  And, its 175 pages assessed "extensive and tedious research" analyzing "far-flung bits and pieces of data." *Nektar*, 34 F.4th at 839; *see also* ¶¶87-103.  For those reasons, another court in this District has held that a similarly-detailed report from Scorpion "is sufficient to survive a challenge at the pleadings stage." *In re QuantumScape Sec. Class Action Litig.*, No. 3:21-CV-00058-WHO, 2022 WL 137729, at *9 (N.D. Cal. Jan. 14, 2022).

That the stock temporarily rebounded modestly the following day before dropping again the next week also does not refute the Complaint's well-pleaded loss causation allegations.  As an initial matter, Defendants cannot substantiate the reason for the temporary bounce.  "'[B]asic economic principles preclude dismissing a complaint' on grounds that the stock price recovered after falling significantly because the rebound can often be explained by external events." *In re CV Sciences, Inc.*, No. 2:18-cv-01602-JAD-BNW, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019) (quoting *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015)).  "At this stage in the litigation, we do not know whether the price rebounds … represent unrelated gains…. Accordingly, the recovery does not negate the inference that [plaintiff] has suffered an economic loss." *Acticon AG v. China N. E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012).  *Tesla*, cited by Defendants, does not support their loss causation argument.  In *Tesla*, the Ninth Circuit noted that the stock price rebounded ***almost entirely*** the following day, and traded ***above*** the unaffected price the following week.  *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021).  Here, by contrast, Ginkgo's price rebounded only modestly the following day, and traded below the unaffected price during the following week.  *See* ECF No. 61-7.

experience in top hedge funds.  *See* https://scorpioncapital.com/about.

1

## VI.     The Complaint Adequately Alleges Secondary Liability Under Section 20(a)

2          Count V adequately pleads that Defendants Kelly and Shetty are secondarily liable for the

3   primary Section 10(b) violations of Ginkgo and Ginkgo employee Wagner.  Defendants challenge this

4   count only as to the underlying primary violation.  *See* DM 20.  Because the primary violation is

5   adequately alleged, *see* Section V, *supra*, Count V must be sustained.

6                                        **CONCLUSION**

7          Because Defendants fail to identify any pleading deficiency, their motion to dismiss should be

8   denied in its entirety and the parties should be directed to commence discovery without further delay.

9   In the alternative, if the Court perceives any pleading infirmity, Plaintiff respectfully requests leave to

10  amend pursuant to Fed. R. Civ. P. 15.  *Osher v. JNI Corp.*, 183 Fed. Appx. 604, 605 (9th Cir. 2006)

11  ("Leave to amend is to be granted with extreme liberality in securities fraud cases, because the

12  heightened pleading requirements imposed by the PSLRA are so difficult to meet").

13

14          Dated: September 6, 2022                          Respectfully submitted,

15                                                           **POMERANTZ LLP**

16                                              By:     */s/ Joshua B. Silverman*
                                                        Joshua B. Silverman (*pro hac vice*)
17                                                      Brian O'Connell (SBN 314318)
                                                        10 S. LaSalle St., Suite 3505
18                                                      Chicago, Illinois 60603
                                                        Telephone: (312) 377-1181
19                                                      jbsilverman@pomlaw.com
                                                        boconnell@pomlaw.com
20

21                                                      Jennifer Pafiti (SBN 282790)
                                                        1100 Glendon Avenue, 15th Floor
22                                                      Los Angeles, CA 90024
                                                        Telephone: (310) 405-7190
23                                                      jpafiti@pomlaw.com

24
                                                        *Lead Counsel for Lead Plaintiff and the*
25                                                      *Proposed Classes*

26                                                      **THE SCHALL LAW FIRM**
                                                        Brian Schall (SBN 290685)
27                                                      2049 Century Park East, Suite 2460
                                                        Los Angeles, CA 90067
28

Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff
and the Proposed Classes*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated: September 6, 2022

POMERANTZ LLP

By:   */s/ Joshua B. Silverman*
Joshua B. Silverman

*Lead Counsel*