UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| SHARON BERNSTEIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GINKGO BIOWORKS HOLDINGS, INC., et al.,<br><br>Defendants. | Case No: 4:21-cv-08943-KAW<br><br>HON. KANDIS A. WESTMORE<br><br><u>CLASS ACTION</u> |

**DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND MOTION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF**

- 1 -

DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF MOTIONS FOR
FINAL APPROVAL AND FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF
4:21-cv-08943-KAW

| Exhibit hereto | Description |
|---|---|
| A | DECLARATION OF MARGERY CRAIG CONCERNING: (A) MAILING OF THE POSTCARD NOTICE; (B) PUBLICATIONS OF THE SUMMARY NOTICE; AND (C) REPORT ON REQUESTS FOR EXCLUSION AND OBJECTIONS |
| B | DECLARATION OF LEAD PLAINTIFF SHARON BERNSTEIN (attached convenience; previously filed as ECF No. 117-3) |
| C | POMERANTZ LLP FIRM RESUME |
| D | DECLARATION OF RINA RESTAINO |
| E | POMERANTZ LLP TIME REPORT BY CATEGORY |

I, JOSHUA B. SILVERMAN, declare as follows pursuant to 28 U.S.C. §1746:

1. I am a partner at Pomerantz LLP ("Pomerantz"), court-appointed Lead Counsel for Lead Plaintiff Sharon Bernstein ("Lead Plaintiff") and the proposed Class,[1] and I am admitted to appear *pro hac vice* before this Court.

2. I have participated in Pomerantz's representation of Lead Plaintiff throughout this litigation. As a result, the facts contained in this Declaration are known personally to me and if called upon to testify as a witness thereto, I could and would competently do so under oath.

3. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this Declaration in support of Lead Plaintiff's motion, pursuant to Federal Rule of Civil Procedure 23, for final approval of the proposed Settlement with Defendants that will resolve the claims asserted in the Action and for final approval of the proposed plan of allocating the net proceeds of the Settlement ("Plan of Allocation"), and in support of Lead Counsel's application for an award of attorneys' fees and litigation expenses and for and an award to the Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee and Expense Application").

4. In support of these motions, Lead Plaintiff and Lead Counsel are also submitting the exhibits attached hereto, the Memorandum of Law in Support of Lead Plaintiff's Unopposed Motion

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings set forth and defined in the Stipulation and Agreement of Settlement dated April 4, 2024 ("Stipulation"). *See* ECF. No. 117-1.

for Final Approval of Proposed Class Action Settlement (the "Final Approval Memorandum") and Memorandum of Law in Support of Lead Counsel's Motion for an award of Attorneys' Fees, Litigation Expenses and Award to Lead Plaintiff (the "Fee Memorandum").

5. Since this Action began in 2021, Lead Plaintiff and Lead Counsel have actively and vigorously prosecuted the claims of Class Members. Only after more than two years of hard-fought litigation did they succeed in achieving the Settlement, which resolves all claims in this Action for a cash payment of $17,750,000.00. As detailed herein, Lead Plaintiff and Lead Counsel believe the proposed Settlement represents an excellent result and is in the best interest of Class Members.

### I.  PROSECUTION OF THE ACTION

6. This Action was first filed on November 18, 2021, asserting claims against Ginkgo, Harry Sloan, Jason Kelly and Mark Dmytruk under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a). ECF No. 1.

7. On March 22, 2022, the parties consented to referral of this Action to a Magistrate Judge for all purposes. ECF No. 29.

8. On March 25, 2022, the Hon. Yvonne Gonzalez Rogers appointed Sharon Bernstein Lead Plaintiff, ECF No. 31, and referred this Action for assignment to a Magistrate Judge for all purposes, ECF No. 32. Pursuant to General Order No. 44 of this District, the Action was assigned to the Hon. Kandis A. Westmore. ECF No. 35.

9. Lead Counsel and Lead Plaintiff launched a thorough factual and legal investigation of potential claims. This investigation included a thorough review of Ginkgo's and Soaring Eagle's filings with the U.S. Securities and Exchange Commission ("SEC") analyst reports, press releases and other publicly available information, a private investigation including interviews with more than a dozen former employees, and consultation with a damages expert.

10. Based on this extensive investigation, Lead Counsel and Lead Plaintiff were able to significantly expand the claims in this Action. On May 26, 2022, Lead Plaintiff filed her First Amended Complaint, ECF No. 45, asserts that Defendants violated §§10(b), 14 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78(n), 78t(a), and SEC

Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §§11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77(k) and 77(o) and expanding the defendants against whom claims were inserted to include, in addition to those named in the initial Complaint, Eli Baker, Scott Delman, Joshua Kazam, Isaac Lee, Timothy Leiweke, Dennis Miller, Reshma Shetty, Arie Belldegrum, Marjin Dekkers, Christian Henry, Reshma Kewalramani, and Shyam Sankar. Each of the newly added Defendants consented to proceed before a Magistrate Judge. *See* ECF No. 77.

11. On July 18, 2022, Lead Plaintiff filed a Second Amended Complaint to correct scrivener's errors. ECF. No. 58. The Second Amended Complaint alleged that Defendants used a negligently prepared Proxy/Registration Statement to: (1) register Ginkgo shares to affect its initial public offering; (2) solicit shareholder approval for the "de-SPAC" merger that Ginkgo used to go public; and (3) dissuade shareholders in the prior SPAC entity, Soaring Eagle, from exercising their right to redeem shares for cash. Lead Plaintiff alleged that the Proxy/Registration Statement misrepresented circular related-party deals, overstated non-related party revenue, and misrepresented certain related parties as independent. Lead Plaintiff also alleged that a subset of Defendants violated Section 10(b) by making misrepresentations with fraudulent intent, and that shares prices dropped $1.39 after a short seller named Scorpion Capital published a report disclosing the information withheld from the Proxy/Registration Statement.

12. On July 21, 2022, all Defendants moved to dismiss the Second Amended Complaint, ECF No. 61, which Lead Plaintiff opposed after thoroughly researching applicable precedent, ECF No. 64.

13. On March 10, 2023, after considering the fully briefed motion to dismiss, the Court issued an Order substantially upholding the Second Amended Complaint. ECF No. 81. The Court ordered that certain factual allegations regarding the Section 11 claim that were discussed in briefing should be added as allegations in a third amended complaint.

14. On March 15, 2023, Plaintiff filed the Third Amended Class Action Complaint (the "Complaint") for the limited purposes of pleading those allegations, which is the operative complaint. ECF No. 82. On April 19, 2023, Defendants answered the Complaint, *see* ECF No. 84.

15. On May 11, 2023, Lead Plaintiff served her first set of requests for production of documents upon Defendants. On June 9, 2023, Lead Plaintiff served her second set of requests for production of documents on Defendants. Lead Plaintiff also responded to document requests and interrogatories, exchanged initial disclosures, prepared her own interrogatories, and served ten (10) subpoenas upon relevant third-parties.

16. In June 2023, Lead Counsel and Defendants' counsel negotiated a joint case management statement, which was filed on June 22, 2003. ECF No. 90.

17. On August 9, 2023, the parties filed a joint stipulation for a protective order. ECF No. 97. On August 11, 2023, the Court entered the protective order. ECF No. 99. Thereafter, Lead Plaintiff began pursuing substantive discovery against Defendants and third parties.

18. As a result of the discovery described above, Lead Plaintiff obtained and Lead Counsel reviewed over 13,000 documents (comprising approximately 145,000 pages), which informed them of the strengths and weaknesses of the claims at issue.

19. Lead Plaintiff also obtained an affidavit from a key witness who was a principal source for the Scorpion Capital report cited in the Complaint.

20. As a result of the private investigation (and in particular discussions with former employees), and the aforementioned discovery, Lead Plaintiff and Lead Counsel were well-informed of the risks to and strengths of the Action when they entered into settlement negotiations.

21. On February 27, 2024, the parties filed a joint motion to continue the initial case management conference and notified the Court that the parties had engaged in mediation discussions since January 30, 2024, which remained ongoing. ECF No. 113. On February 29, 2024, the Court granted the joint motion and set the initial case management conference to March 19, 2024. ECF No. 114.

II.     **NEGOTIATIONS LEADING TO THE SETTLEMENT**

22. On January 30, 2024, the parties engaged in a hotly-contested full-day mediation session before an experienced mediator familiar with securities class actions, Michelle Yoshida. Although this mediation session did not result in an immediate resolution, the parties continued their

negotiations with Ms. Yoshida's assistance.

23. After several additional rounds of negotiation did not yield a settlement, Ms. Yoshida issued a confidential mediator's proposal to settle this Action with a full release for $17,750,000.

24. Both sides accepted the mediator's proposal, resulting in the Settlement. Thereafter, the parties documented their agreement in a Stipulation of Settlement.

25. On March 8, 2024, Lead Plaintiff filed a notice of settlement and request to vacate all case deadlines and stay proceedings. ECF No. 115. The Court granted the request. ECF No. 116.

26. On April 11, 2024, Lead Plaintiff filed her unopposed motion for preliminary approval of settlement. ECF No. 117. On July 31, 2024, the Court granted the unopposed motion for preliminary approval of settlement. ECF No. 126.

### III. LEAD PLAINTIFF'S NOTICE PROGRAM COMPLIED WITH THE PRELIMINARY APPROVAL ORDER

27. Pursuant to and in compliance with the Preliminary Approval Order, the Court-appointed Settlement Administrator, Strategic Claims Services ("SCS"), an independent company with extensive experience administering securities class actions, is reviewing and processing the claims under Lead Counsel's supervision, and will provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claims by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court. *See* Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Craig Decl."), attached hereto as **Exhibit A**.

28. SCS, mailed the Postcard Notice to potential Class Members, published Summary Notice of Pendency and Proposed Class Action Settlement ("Summary Notice") in *Globe Newswire*, and posted at a URL it dedicated to this Settlement, the Notice of Pendency and Proposed Settlement of Class Action, ("Long Notice") and the Proof of Claim and Release Form ("Proof of Claim").

29. The contents of the Notice Program[2] provided all necessary information for Class Members to make an informed decision regarding the Settlement and contained all of the information required by Rule 23(c)(2)(B), the PSLRA, and Northern District's Guidance. The Notice Program identified, among other things: (1) the nature of the case and the claims asserted; (2) the definition of the Class; (3) the $17,500,000 Settlement Amount; (4) the Plan of Allocation; (5) the reasons why the Parties are proposing the Settlement; (6) the estimated average recovery per affected share; (7) the request for attorneys' fees of no more than twenty-five percent (25%) of the Settlement Fund and an Award to Lead Plaintiff of $5,000; (8) the identity and contact information for Lead Counsel; (9) Class Members' right to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses as well as the right to request exclusion; (10) the binding effect of a judgment on Class Members; (11) the amount of Lead Plaintiff's award; and (12) the dates and deadlines for Settlement-related events.

30. To ascertain Class Members to whom SCS distributed the Notice Program, first, Ginkgo provided SCS with a shareholder list from its transfer agent. SCS then contacted 2,305 nominees, including 1,039 banks and brokerage companies and 1,266 mutual funds, insurance companies, pension funds, and money managers. Craig Decl., ¶4. SCS mailed 18,994 Postcard Notices to potential Class Members from the names it received. *Id*. at ¶5. Additionally, a nominee informed SCS that it emailed 44,930 of its customers to inform them of the Settlement and provide a link to the Notice and Proof of Claim on SCS's website and a total of 53,538 emails have been sent to date. *Id*. at ¶6. In total, 72,532 potential Class Members were notified by either mailed Postcard Notice or email the direct link to the location of the Notice and Proof of Claim on the settlement webpage. *Id.* at ¶7. Of the 18,994 Post Card Notices mailed, 47 were returned as undeliverable. *Id*. at ¶8. The United States Postal Service Provided forwarding addresses for 10, and the notice was immediately re-mailed. *Id*. SCS obtained skip traces with the best available addresses for the remaining 37 and 17 were re-mailed to updated addresses. *Id.*

---

[2] "Notice Program" means collectively the Long Notice, Summary Notice, and the Postcard Notice.

- 7 -

DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF MOTIONS FOR
FINAL APPROVAL AND FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF
4:21-cv-08943-KAW

31. On September 4, 2024 and September 18, 2024, SCS published a Summary Notice electronically over *Globe Newswire*. *Id*. at ¶9.

32. SCS also maintains and posted to a Settlement-dedicated URL a summary of the Settlement, the Long Notice, Proof of Claim, the Stipulation of Settlement, and the Preliminary Approval Order. *Id*. at ¶11.

33. Pursuant to the Preliminary Approval Order, Class Members have until November 21, 2024, to request exclusion or to submit objections to any aspect of the Settlement, including awarding of fees and expenses. *Id*. at ¶¶12-13. To date, SCS and Lead Counsel have not received any objections and or requests for exclusion. *Id*. If we receive any objections or further exclusion requests, we shall address them in Lead Plaintiff's reply papers in further support of Final Approval.

34. The Notice Program provided the best notice practicable, combining individually mailed notice to all Class Members who could be identified with reasonable effort, supplemented by the Summary Notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, thereby satisfying all requirements of Rule 23, due process, the PSLRA, and the Northern District's Guidance.

35. The Long Notice, attached to the Craig Decl. as Exhibit A, includes the comprehensive Plan of Allocation, detailing how SCS, under Lead Counsel's direction, will divide and distribute the Net Settlement Fund.

36. Although the dates for objection and exclusion have not yet passed, to date, no Class Member has objected to or requested exclusion from the Settlement.

IV.  **COUNSEL'S VIEW OF THE SETTLEMENT RELATIVE TO THE RISKS OF CONTINUED LITIGATION**

37. Lead Counsel believes that the all-cash, non-reverting Settlement of $17,750,000 provides an exceptional recovery to the Class, and should be approved as fair, reasonable and adequate. Lead Plaintiff, as set forth in her declaration, shares that view. I attach hereto, as **Exhibit B,** the Declaration of Sharon Bernstein previously filed at ECF No. 117-3 ("Bernstein Decl."), outlining her participation and assistance in securing this result for the Class.

- 8 -

DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF MOTIONS FOR
FINAL APPROVAL AND FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF
4:21-cv-08943-KAW

38. In reaching this assessment, we have considered the amount of the Settlement relative to damages that might be recovered in a successful trial, recoveries in comparable cases, and the risks and benefits of continued litigation.

39. After consulting with a damages expert, Lead Counsel estimates that class-wide damages for the Section 10(b) claims are $39.8 million, and for the Section 11 claims are $47.2 million after accounting for negative causation, which I estimate to be a substantial affirmative defense here. These damages are overlapping, not cumulative. Lead Counsel does not estimate that the Section 14 claims provide any damages that are not fully accounted for within the estimates provided under Section 10(b) and Section 11. Thus, the Settlement recovery represents between 37.6% and 44.56% of the total amount of aggregated estimated damages that counsel estimated for the Section 10(b) claims in consultation with its damages expert, and 37.6% of estimated aggregate damages for Section 11 claims after negative causation. I consider this an excellent recovery for Class Members, especially given the real risk of a smaller recovery (or if any) at trial, and is in line with settlement amounts in similar cases. This percentage of recovery also greatly exceeds acceptable percentages in this Circuit. *See, e.g.*, *In re Splunk Inc. Sec. Litig.*, Case No. 20-cv-08600-JST, 2024 WL 923777, at *6 (N.D. Cal. Mar. 4, 2024) (settlement amount "between approximately 5% and 20.5% of the realistic maximum damages" for a securities class action are "fair and reasonable"); *Kendall v. Odonate Therapeutics, Inc.*, Case No. 3:20-cv-01828-H-LL, 2022 WL 1997530, at *5 (S.D. Cal. June 6, 2022) (approving settlement of securities class claims that represented "approximately 3.49% of the maximum estimate damages, which is higher than the 2021 median recovery in securities class actions"); *In re Aqua Metals, Inc. Sec. Litig.*, Case No. 17-cv-07142-HSG, 2022 WL 612804, at *6 (N.D. Cal. Mar. 2, 2022) (settlement that "constitutes 7.3% of the most likely recoverable damages" was "is in line with comparable class action settlements"); *In re Biolase, Inc. Sec. Litig.*, Case No. SACV 13-1300-JLS (FFMx), 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement of "approximately 8%" of damages "equals or surpasses the recovery in many other securities class actions").

40. I believe this Settlement is especially favorable when considering the risks of

continued litigation. It provides the Class with a guaranteed recovery while avoiding the substantial risks the Class would otherwise face, including:

    a.    the risk of proving materiality and falsity for all claims, particularly the alleged misrepresentation of the relationship between Ginkgo and the related companies that were its largest customers, and Ginkgo's ability to generate non-related party revenue. Defendants could point to public records and other text within Ginkgo's filings from which an investor might piece together at least some of the truth that Lead Plaintiff alleged was misrepresented;

    b.    the risk of proving loss causation and damages for Section 10(b) and Section 14 claims, and for disproving an affirmative defense of negative causation for Section 11 claims. Defendants have steadfastly maintained that no losses could accrue as a result of any omission after a short seller report was published on October 6, 2021;

    c.    the risk of proving scienter for Section 10(b) claims, which is always a difficult element to prove and often turns on circumstantial evidence. Direct evidence rarely exists. Accordingly, Lead Plaintiff confronted difficult factual and legal challenges in connection with proving scienter for the Exchange Act claims. How a jury would interpret and apply these facts to the law is not certain. While Lead Plaintiff believes she could amass evidence to prove that Defendants recklessly misled investors, if the Court or a jury were to accept Defendants' arguments, the Class would recover nothing.;

    d.    the risk of disproving an affirmative defense of due diligence for all of the individual defendants;

    e.    the risk that the corporation could become insolvent or insurance depleted over the course of a trial and appeal;

    f.    the risk of certifying a class on a contested basis, which Defendants indicated they would oppose;

    g.    the risk that an expert might be excluded;

    h.    the risk of losing at summary judgment, or at trial, and in particular, the risk that certain witnesses may not appeal to a jury or certain experts may not be persuasive in a "battle of the experts";

    i.    the risk that any verdict, even if favorable, might be less than the Settlement Amount; and

    j.    the risk of any favorable verdict being overturned or reduced on post-trial motions or appeal. Even if Lead Plaintiff prevailed on liability on any of her claims and the jury awarded damages, Defendants would likely appeal the verdict and award. The appeals process would likely span several years, during which time the Class would receive nothing. In addition, an appeal would carry with it the risk of reversal, in which case the Class would receive no recovery despite having prevailed at trial.

41. The expense and duration of protracted litigation, including class certification, summary judgment, preparing and trying the case to a jury and any appeals, would be significant. If litigation were to continue, Lead Plaintiff would also have to retain costly subject matter, accounting and econometric experts. Barring a settlement, this case would be litigated for years with no assurance of a better outcome for the Class, if any at all.

42. Considering all of these circumstances and risks of continued litigation against the immediate and certain benefit of the Settlement, Lead Counsel strongly believes that the Settlement is in the best interests of Class Members.

## V.    THE PLAN OF ALLOCATION

43. As provided in the Long Notice, SCS will distribute the Net Settlement Fund according to the Plan of Allocation the Court preliminarily approved (Ex. A to the Craig Decl. at 10-14). The Plan of Allocation was designed to distribute the Net Settlement Fund equitably and rationally. Lead Counsel developed the Plan of Allocation after consulting an expert on damages. Lead Plaintiff and Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to distribute the Net Settlement Fund among Authorized Claimants.

44. The Plan of Allocation provides for the Net Settlement Fund's distribution among

Authorized Claimants on a *pro-rata* basis based on "Recognized Loss" formulas tied to liability and damages.

45. Pursuant to the Plan of Allocation, SCS, under Lead Counsel's direction, will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants. Calculation of Recognized Loss will depend upon several factors, including the dates Authorized Claimants purchased the securities, and whether the securities were sold during the Class Period, and if so, when.[3]

46. For example, the Plan of Allocation provides for recovery for shares purchased between May 11, 2021 and October 5, 2021 under Section 10(b), on a *pro-rata* basis based on the Class Member's recognized loss, which incorporates a 90-day lookback period, the advice of Lead Plaintiff's experts, and the principles of economic loss articulated by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). It also calculates Section 11 damages based on the statutory formula while accounting for the significant negative causation defense available to Defendants at trial. To avoid duplication, the Plan of Allocation provides that a Class Member will receive the greater of her Section 11 or Section 10(b) damages. Overall, the Plan of Allocation provides for customary *pro rata* distribution of the Net Settlement Fund among all Authorized Claimants.

47. In sum, the proposed Plan of Allocation, developed with Lead Plaintiff's damages consultant, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Plaintiff and Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

---

[3] After SCS completes the claims administration process, giving rejected claimants the opportunity to reasonably cure document deficiencies or contest the rejection of their claims, Lead Plaintiff will file a motion seeking the Court's approval of the Settlement Administrator's findings and authority to distribute the Net Settlement Fund.

## VI. THE APPLICATION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

### A. Attorneys' Fees

48. Lead Counsel has received no compensation to date for its representation of Lead Plaintiff and the Class. For its efforts, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As explained in the Fee Memorandum, courts within the Ninth Circuit recognize that the percentage-of-recovery method is the prevailing and appropriate method of determining attorneys' fees.

49. The Notice Program stated that Lead Counsel would seek up to twenty-five percent (25%) of the Settlement Fund, Craig Decl., Exs. A, C-D thereto, and Lead Counsel now seeks a fee award of twenty-five percent (25%) of the Settlement Fund. To date, no Class Member has objected to such an award. For the reasons discussed herein, this award is fair and reasonable.

50. *First*, Lead Counsel believes that the extraordinary result supports the requested fee. While 25% is a benchmark fee, the result achieved was far greater than the typical securities class action recovery.

51. *Second*, as noted above, this Settlement was achieved despite substantial risks in the litigation. *See* ¶¶37-42, *supra*.

52. *Third*, the result achieved was a direct result of the skill and efforts of Lead Counsel,[4] and was achieved over the zealous representation of world-class lawyers on the other side from Wachtell, Lipton, Rosen & Katz LLP and Morrison Foerster LLP. This recovery was not the result of a government investigation, but rather the aggressive development of Class claims by Lead Counsel and Lead Plaintiff. Significantly, their development of claims in the amended complaints filed following appointment of Lead Plaintiff and approval of her counsel as Lead Counsel greatly expanded the damages, chances for recovery, and defendants liable. Moreover, as detailed below, Plaintiffs' Counsel expended 2,668.25 hours to prosecute this Action for the benefit of the Class.

53. *Fourth*, Lead Counsel worked for years and advanced considerable expenses knowing

---

[4] I am attaching as **Exhibit C**, an up-to-date version of my firm's resume extensively detailing its experiences and success in securities class actions across the country.

- 13 -

DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF MOTIONS FOR
FINAL APPROVAL AND FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF
4:21-cv-08943-KAW

that there was a very real chance it may recover nothing at all. Lead Counsel believes the contingent nature of its representation warrants a benchmark percentage, especially as that amounts to a reasonable multiplier of its lodestar.

54. *Fifth*, the percentage fees awarded in comparable cases, and in privately negotiated contingency agreements, supports the fees here. As noted in the Fee Memorandum, courts often award higher than benchmark fees. Here, only a benchmark fee is sought.

55. *Sixth*, the percentage requested is lower than that negotiated *ex ante* in Lead Plaintiff's retainer agreement with Lead Counsel. That agreement allowed a fee of up to 33% to be sought.

56. *Seventh*, a lodestar cross-check confirms the reasonableness of the fee request. Attorneys and other timekeepers at Lead Counsel record their time contemporaneously and it is maintained in Lead Counsel's accounting system. I have reviewed that time, trimmed or eliminated entries where I believed appropriate, and ensured that it properly tracked the efforts expended on this case. Such records show that the total number of hours spent on the litigation of the Action by my firm through October 14, 2024 is 2,621.25. The total lodestar amount for attorney and paralegal time based on the firm's current rates is $1,791,877.50. No time spent on the Fee Memorandum was included in these amounts. A breakdown of the lodestar is set forth in the chart below:

| NAME AND STATUS | TOTAL HOURS | RATE | TOTAL LODESTAR |
|---|---:|---:|---:|
| Joshua B. Silverman (P) | 530.30 | $1100 | $583,330.00 |
| Alex Hood (P) | 4.20 | $975 | $4,095.00 |
| Omar Jafri (P) | 3.10 | $975 | $3,022.50 |
| Brian O'Connell (OC) | 854.60 | $700 | $598,220.00 |
| Christopher Tourek (OC) | 10.50 | $700 | $7,350.00 |
| Thomas Pryzyblowski (A) | 2.95 | $600 | $1,770.00 |
| Genc Arifi (A) | 160.00 | $600 | $96,000.00 |
| Diego Martinez-Krippner (A) | 53.60 | $600 | $32,160.00 |

| Karina Trevino (PA) | 1002.00 | $465 | $465,930.00 |
|---|---|---|---|
| **Total:** | 2621.25 | | $1,791,877.50 |

(P) –  Partner; (OC) – Of Counsel  (A) – Associate; (PA) –  Project Associate

57. The hourly rates for attorneys and professional support staff included in these schedules are reasonable, have been approved by other courts, and are in line with firms in their legal markets.

58. As set forth in the attached Declaration of Rina Restaino, attached as **Exhibit D** hereto, Plaintiffs' Counsel at The Schall Law Firm expended an additional 47 hours at a lodestar of $38,100.

59. Therefore, Plaintiffs' Counsel, in the aggregate, expended 2,668.25 hours, amounting to a total lodestar of $1,829,977.50.[5] The requested fee of 25% of $17,750,000, or $4,437,500, represents a modest lodestar multiplier of 2.42, just under the midpoint of the range that the Ninth Circuit has cited as common and appropriate. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (holding approval of fees amounting to 3.68 times lodestar was appropriate and noting that most fees awarded constituted multipliers of lodestar between one and four).

    **B.**    **Litigation Expenses**

60. The Notice Program informed investors that Lead Counsel would also seek payment of its litigation expenses, in an amount not to exceed $325,000. *See* Exs. A, C-D to Craig Decl. No Class Member has objected to this request.

61. From the beginning of the Action, Lead Counsel was aware that it might not recover any expenses. Thus, Lead Counsel was motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of this Action.

62. The expenses incurred are reflected in the books and records contemporaneously prepared by the firm. These books and records are prepared from expense vouchers, invoices, and other billing records, and are an accurate record of the expenses incurred. I have reviewed the

---

[5] Pursuant to the Procedural Guidance for Class Action Settlements, I am attaching as **Exhibit E**, a chart setting forth the amount of hours spent by each attorney from Pomerantz in each phase of the Action.

- 15 -

DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF MOTIONS FOR
FINAL APPROVAL AND FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF
4:21-cv-08943-KAW

expenses for which reimbursement is sought and confirmed that they were reasonably necessary for the effective and efficient prosecution and resolution of the litigation, and are reasonable in amount. The expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

63. Pomerantz's compensation for services rendered and out-of-pocket expenses incurred in this Action was and is entirely contingent on the success of the prosecution of the Action, and on the Court's approval of the fee and expense application. None of the attorneys' fees and expenses submitted to this Court has been paid from any source or has been the subject of any prior request or prior award in any litigation or other proceeding.

64. The litigation expenses incurred, totaling $203,929.20, were reasonably necessary to prosecute this Action. Most involved expert fees. Other substantial categories of litigation expenses include investigator fees, mediation fees, and court fees. They are broken down as follows:

| **EXPENSE CATEGORY** | **AMOUNT** |
|---|---|
| Expert Fees | $145,738.50 |
| Private Investigator Fees | $20,099.25 |
| Online Research Costs | $8,663.45 |
| Court Filing, Process Server, and Press Release Fees | $4,512.40 |
| eDiscovery Fees | $8,803.82 |
| Mediator Fees | $14,831.25 |
| FedEx, Clerical Overtime, Postage, and Photocopy Costs | $1,133.38 |
| Travel and Meals | $147.20 |
| **Total:** | **$203,929.20** |

C. **Award to Lead Plaintiff**

65. The Notice Program informed Class Members that Lead Counsel would also seek an award under the PSLRA to Lead Plaintiff Sharon Bernstein of $5,000. *See* Exs. A, C-D to Craig Decl. No Class Member objected to that request.

- 16 -

DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF MOTIONS FOR
FINAL APPROVAL AND FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND AWARD TO LEAD PLAINTIFF
4:21-cv-08943-KAW

66. Ms. Bernstein was far more engaged than most lead plaintiffs. Lead Counsel believes that her involvement conferred considerable benefit upon the Class, and that her efforts, if directed elsewhere, would be worth far more than the $5,000 she requests. *See* Ex. B, Bernstein Decl., outlining her participation and assistance in securing this result for the Class.

## VII. CONCLUSION

67. In view of the recovery to the Class and the substantial risks of this litigation, Lead Counsel believes that the Settlement is fair, reasonable, and adequate and respectfully requests the Court to grant final approval of the Settlement, approve the Plan of Allocation, award attorneys' fees in the amount of twenty-five percent (25%) of the Settlement Fund and litigation expenses of $203,929.20, plus interest accrued on both amounts, and award Lead Plaintiff $5,000 for her time and resources expended for the benefit of the Class as allowed by the PSLRA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 17, 2024, at Chicago, IL.

Joshua B. Silverman